**LEHMAN BROTHERS KUHN LOEB INCORPORATED, Appellee,**

v.

**CLARK OIL & REFINING CORPORATION, Appellant.**

**Intervenor:**

**United States for appellee.**

**No. 83–1874.**

United States Court of Appeals, Eighth Circuit.

Submitted March 9, 1984.

Decided July 11, 1984.

Peper, Martin, Jensen, Maichel & Hetlage, William A. Richter, Lewis R. Mills, Mark S. Packer, St. Louis, Mo., for appellee.

Bernard A. Barken, Gary H. Feder, Shifrin, Treiman, Barken, Dempsey & Ulrich, St. Louis, Mo., for appellant.

J. Paul McGrath, Asst. Atty. Gen., Thomas E. Dittmeier, U.S. Atty., Michael F. Hertz, Peter R. Maier, Attys., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for intervenor the U.S.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges, en banc.

ROSS, Circuit Judge.

The appellee, Lehman Brothers Kuhn Loeb Incorporated, filed a complaint in the United States District Court for the Eastern District of Missouri, seeking damages for an alleged breach of contract and naming as defendant Clark Oil & Refining Corporation. This matter, by consent of the parties, was referred to a magistrate[1] pursuant to 28 U.S.C. § 636(c). The parties each filed a motion for summary judgment and the court granted the appellee's motion. An appeal was filed and argued to a panel of this court which recommended a rehearing before the court en banc because of the importance of one of the issues. In addition to challenging the magistrate's order granting summary judgment, the appellant has put into question the constitutionality of 28 U.S.C. § 636(c). We hold that summary judgment was properly granted and that section 636(c) is constitutional.

### I. Section 636(c) of the Magistrates Act.

█ Section 636(c)(1) provides, *inter alia*, that upon the consent of the parties, and when designated to exercise this jurisdiction by the district court, a magistrate may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case. Section 636(c)(3) allows for a direct appeal to the appropriate circuit court, or should they so agree, the parties may appeal the magistrate's judgment to the district court. 28 U.S.C. § 636(c)(4).

The appellant bases its challenge to section 636(c) on Article III[2] of the Constitution and on the reasoning expounded in *Pacemaker Diagnostic Clinic v. Instromedix, Inc.*, 712 F.2d 1305 (9th Cir.1983) (hereinafter *Pacemaker I*). In that case three judges of the Ninth Circuit construed *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) and concluded that Section 636(c) of the Magistrates Act violates Article III of the Constitution because it vests judicial power in courts whose chief officers are not insulated by life tenure and a guarantee that their salaries will not be diminished during their continuance in office. *Pacemaker I* at 1309. En route to this determination, the panel concluded that this grant of power was too extensive to fairly support a characterization of the magistrate as an adjunct of the district court. *Id.* at 1310. The panel also observed that under section 636(c) magistrates were given the power to

---

1. David D. Noce, United States Magistrate, Eastern District of Missouri.

2. Article III, Section 1 reads:
    The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office.

adjudicate rights which could not fit within the circumference of a traditional exception to Article III—forums for congressionally created substantive rights. *Id.* at 1310.

The panel in *Pacemaker I* decided that section 636(c) could not be saved by analogizing it to an arbitrator's decision and declaring the constitutional issue to be one concerning only due process rights which could be waived by the parties. *Id.* 1310–1312. In addition an argument was rejected which would distinguish section 636(c) from the traditional separation of powers problem because the magistrates remain under the control of the Article III judiciary, the branch whose power is arguably invaded. *Id.* at 1312. Finally, the panel also decided that the availability of appellate review by an Article III court could not cure the constitutional ills it found apparent in section 636(c). *Id.* at 1313.

Unlike the panel in *Pacemaker I,* we do accept some of the arguments outlined above and find that section 636(c) is constitutional. In so doing we share in the conclusion arrived at by the courts [3] in *Pacemaker Diagnostic Clinic v. Instromedix, Inc.,* 725 F.2d 537 (9th Cir.1984) (*en banc*) (hereinafter *Pacemaker II*) (reversing *Pacemaker I*); *Collins v. Foreman,* 729 F.2d 108 (2d Cir.1984); *Goldstein v. Kelleher,* 728 F.2d 32 (1st Cir.1984); and *Wharton-Thomas v. United States,* 721 F.2d 922 (3d Cir.1983). As an initial matter we agree with the Third Circuit's determination in *Wharton-Thomas* and find that this issue is not controlled by the Supreme Court's decision in *Northern Pipeline, supra. Id.* at 926. In *Northern Pipeline, supra,* Justice Rehnquist, concurring and joined by Justice O'Connor, specifically limited the extent of the concurrence, and thus the actual holding, to:

> I would, therefore, hold so much of the Bankruptcy Act of 1978 as enables a Bankruptcy Court to entertain and decide Northern's lawsuit *over Marathon's ob-*

*jection* to be violative of Art. III of the United States Constitution.

*Northern Pipeline* 458 U.S. at 91, 102 S.Ct. at 2882 (emphasis added). Both parties in this case did affirmatively consent to submit the controversy to a magistrate and *Northern Pipeline* is distinguishable on this ground.

The arguments attacking the constitutionality of section 636(c) draw their essential themes from either of two basic categories: due process or separation of powers. We agree with the court in *Goldstein v. Kelleher, supra,* when it wrote:

> But insofar as Article III protects individual litigants, those protections can be waived. *Cf. Patton v. United States,* 281 U.S. 276, 281 [50 S.Ct. 253, 74 L.Ed. 854] (1930) * * * (waiver of sixth amendment guarantee of trial by jury). The plaintiff as well as the defendant here voluntarily consented to have this action handled through to judgment by a magistrate. They gave their consent pursuant to procedures designed to insulate this choice from influence by either the district judge or the magistrate. 28 U.S.C. § 636(c)(2).

*Goldstein* at 35.

The more troublesome arguments are based on the separation of powers aspect of Article III. In this area we are persuaded by the reasoning of the majority in *Pacemaker II* when it drew a distinction between this issue and the "paradigmatic separation of powers case, where the integrity of one branch is threatened by another which attempts an arrogation of power to itself." *Pacemaker II* at 544 (citations omitted). As the majority in *Pacemaker II* went on to note, the various provisions of the Magistrates Act controlling, for example, the appointment of magistrates, *Section 636(a);* reference of cases to, and recall from, magistrates, *Section 636(b)(1) & (c)(6);* and appellate review, *Section 636(c)(4) & (5);* leave Article III courts firmly in control of the system as a whole.

---

**3.** In *Puryear v. EDE's LTD,* 731 F.2d 1153, 1154 (5th Cir.1984), the Fifth Circuit also concluded that section 636(c) is constitutional.

*Id.* at 544. In our opinion these mechanisms limit the magistrate's role to that of adjunct, safeguard the integrity of the Article III judiciary, and keep section 636(c) within the bounds set by Article III of the Constitution.

## II. The Order Granting Summary Judgment

The appellee, an investment bank, in May of 1979 contracted with the appellant to assist it, first in the sale of certain assets, and subsequently in exploring the possibility of a merger, acquisition, or sale. The appellee was to receive quarterly payments on a retainer of $180,000 per year in exchange for its services. (This amount was subsequently reduced to $100,000 per year.) The contract also included the following provision:

> If the Board of Directors of Clark ultimately decided that the sale of the Company were in the best interests of your shareholders, we would act as your agent in this process for a fee amounting to .4% of the consideration paid. Such fee is subject to offset for retainer payments described in Section 3, Page Three, hereof but is not subject to the maximum fee set forth in Section III, Page One, hereof.

> If a transaction should occur between a Clark director, officer, a stockholder of more than 10% or other affiliated person, including trusts for families of the foregoing, or such person's representative, and a third party, no transaction fee will be paid to LBKL under the terms of this Agreement, unless such transaction is a part of Clark's merger or financial program or unless LBKL has·been specifically engaged by Clark by separate written agreement to assist it in such transaction.

In 1979 Apex Oil Company began purchasing the appellant's stock on the open market. The appellee, at the direction of the appellant's management, investigated Apex Oil and prepared a strategy against the uninvited attempt to acquire the company. Unknown to both the management of the appellant company and the appellee the founder of the company, Emory T. Clark, began negotiations to sell all the stock owned by the Clark family to Apex Oil Company in the spring of 1981.

On July 14, 1981, the board of directors was informed of the negotiations and asked by Emory Clark to release certain nonpublic information to Apex Oil Company. The appellant's board of directors ordered the appellee to continue the search for a "white knight." The appellee's efforts in this endeavor proved unavailing and on July 31, 1981, a representative of Emory Clark requested that the board of directors approve the terms of Apex's proposed tender offer. Following a report prepared by the appellee on the fairness of the offer, the board of directors did approve the offer and recommended acceptance by all Clark shareholders. Apex subsequently purchased nearly all of the outstanding Clark Oil stock.

Following the sale of the stock, the appellee requested payment, pursuant to the quoted portion of the contract, in the amount of $1,953,227.58. That sum represents .4% of the total price of $497,694,-396.00, less the retainer deduction of $37,-500.00. This demand was refused, suit was filed, and the magistrate granted summary judgment in favor of the appellee, awarding the entire amount claimed. The appellant argues that summary judgment was improperly granted because the contract is ambiguous and material questions of fact remain in issue.

The standards governing summary judgment are well established. Summary judgment is appropriate when there is no genuine issue about material facts and the moving party demonstrates its right to judgment as a matter of law. *Butler v. MFA Life Ins.*, 591 F.2d 448, 451 (8th Cir.1979). The appellant argues that the contract was ambiguous in that the meaning of the terms "the sale of the Company," "we would act as your agent in this process," and "unless such transaction is. part of Clark's merger or financial program," is not clear.

■ Whether a contract is ambiguous is a question of law which is answered by the application of the following principles:

The disputed language is to be examined in the context of the entire agreement. It is ambiguous if reasonably susceptible of more than one construction. *Sun Oil Co. v. Vickers Refining Co.,* 414 F.2d 383, 386–87 (8th Cir.1969). The words of the contract are to be given their plain and ordinary meaning as understood by a reasonable, average person. *In re SEC v. White & Co., Inc.,* 546 F.2d 789, 792 (8th Cir.1976).

*Universal Towing Co. v. United Barge Co.,* 579 F.2d 1098, 1101 (8th Cir.1978). After applying these principles to the contract in this case, we are satisfied that no ambiguity exists. In our opinion the magistrate correctly ruled that the terms of the contract were clear when read in the context of the entire agreement. Even under the standards of summary judgment "contracts are subject to construction, however, only when ambiguous and ambiguity cannot be created by the mere assertion of a party to it." *Elbow Lake Coop Grain Co. v. Commodity Credit Corp.,* 251 F.2d 633, 637 (8th Cir.1958).

■ The only remaining question is whether the appellee has established that all conditions precedent to its right to a fee of .4% of the consideration were fulfilled. The magistrate ruled that appellee carried this burden and we agree. It is clear that Clark Oil was "sold," because substantially all of the outstanding stock was purchased by Apex. The appellant's board of directors in recommending that the stockholders accept the Apex offer necessarily determined that the sale was in their best interests. The appellee's services in investigating Apex, in searching for a "white knight," and in standing ready to perform other duties at the request of the board, fulfill the condition expressed by the language "would act as your agent in this process." Finally, because the sale of the

stock belonging to the Emory T. Clark family trust was integrated with the purchase of stock held by third parties and because the sale of all the stock was accomplished with the cooperation of the board of directors, the magistrate correctly held that the sale of the family stock was a part of "Clark's merger or financial program."

For the foregoing reasons the decision of the magistrate is affirmed.

LAY, Chief Judge, joined by ARNOLD and BOWMAN, Circuit Judges, dissenting in part.

I concur in Judge Arnold's dissenting opinion, but wish to add some additional remarks.

The majority initially notes that the constitutional attacks on the Magistrates Act are derived from two basic Article III concerns: due process and separation of powers. The majority then cites, and agrees with, *Goldstein v. Kelleher,* 728 F.2d 32, 35 (1st Cir.1984), for the proposition that "insofar as Article III protects individual litigants, those protections can be waived." I agree that consent may be relevant to due process; indeed, if a party stipulates that an abbreviated procedure may govern an adjudicatory finding of any tribunal, it should be obvious that the party cannot complain. If the consensual-referral argument was used only for this proposition, I would have no problem. The cases cited and relied on by the majority, however, go much further.

In *Wharton-Thomas v. United States,* 721 F.2d 922 (3d Cir.1983), for example, a similar case cited and relied on by the majority, the court stated: "The question in the present case is not whether Congress may constitutionally *delegate* case dispositive authority to a non-Article III officer, but whether the parties may, by consent, have a case tried to judgment before a magistrate." *Id.* at 928 n. 9 (emphasis original).[1] I totally disagree with this rea-

---

1. The Ninth Circuit also used broad language in reliance on litigant consent and gave deference to the Third Circuit's conclusion "that consent under § 636(c) cures any constitutional defects." *Pacemaker Diagnostic Clinic of America v. Instromedix,* 725 F.2d 537, 542 (9th Cir.1984)

soning. I think the fundamental issue is what the Third Circuit rejects: whether Congress can constitutionally delegate case dispositive authority—which I believe is, in essence, the judicial power of the United States—to a non-Article III officer. Article III adequately addresses this when it delimits where the judicial power may be vested and how the judges therein shall hold office. It should be clear this limitation cannot be exceeded by parties acquiescing in the expansion of judicial authority. Private parties cannot authorize the judicial power of a constitutional tribunal.[2] The exercise of governmental authority may only be sanctioned by the terms of the charter authorizing it.[3] Therefore, I believe that the concern should not be whether there exists consensual reference to a non-Article III judge, but whether Congress has the constitutional authority to pass such legislation.

My conclusion that Congress may not delegate such authority to a non-judicial officer is supported in large part by *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The Supreme Court upheld a statute that permitted the district court to give the magistrate's proposed findings of fact and recommendations such weight as their merit commands and the sound discretion of the judge warrants. The Court held that this delegation of authority to the magistrate did not violate Article III *"so long as the ultimate decision is made by the district court." Id.* at 683, 100 S.Ct. at 2416 (emphasis

added). The saving grace of this delegation—a de novo review by a district court exercising ultimate authority—is glaringly absent here. There exists no Article III de novo review when the parties consent to the jurisdiction of a magistrate under section 636(c), and the direct appeal provision to the circuit court is not a saving feature. *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 86 n. 39, 102 S.Ct. 2858, 2879 n. 39, 73 L.Ed.2d 598 (1982) ("Our precedents make it clear that the constitutional requirements for the exercise of the judicial power must be met at all stages of adjudication, and not only on appeal . . . .").

To urge, as *Pacemaker II* and this majority do, that magistrate appointment, case reference and recall, and appellate review is sufficient Article III supervision ignores, I feel, the historical underpinnings of Article III. The magistrate's role is not limited to that of an adjunct. These non-Article III judges have been given power to adjudicate "laws of national applicability and affairs of national concern." *Palmore v. United States*, 411 U.S. 389, 408, 93 S.Ct. 1670, 1681, 36 L.Ed.2d 342 (1973). This, I feel, is an unconstitutional delegation, by Congress, of the judicial power of the United States to judges that are not protected by the dictates of Article III.

If bankruptcy judges and magistrates are to be given Article III authority, they must be made Article III judges. As

(en banc). *See also Goldstein v. Kelleher*, 728 F.2d 32, 34–35 (1st Cir.1984) ("We agree with the en banc decision of the Ninth Circuit and with an earlier decision of the Third Circuit that section 636(c)(3) is not unconstitutional. . . . As we find little to add to Judge Weis's thorough discussion in *Wharton-Thomas*, we rely in particular on the reasoning in that case. . . .").

2. It is well settled that parties may not by stipulation "invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy.'" *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975). The reasoning behind this fundamental premise is that litigants cannot by private agreement transcend the limits of a constitutional government beyond the framework of

the Constitution. It is for this fundamental reason that jurisdiction of the federal courts cannot extend beyond that given by the Constitution. It is also for this reason that parties may not consent to subject matter jurisdiction in the federal courts in the same manner that they waive personal jurisdiction or other non-jurisdictional rights. Although we are not concerned with subject matter jurisdiction, we are faced with an analogous argument, that the parties may consent to the exercise of judicial power not otherwise authorized by the Constitution.

3. As Chief Justice Marshall stated: "We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

Judge Arnold points out, without the structure of judicial independence mandated by Article III, bankruptcy judges and magistrates fall short of the authority to exercise the judicial power of the United States. This constitutional fact alone sufficiently denigrates the congressional attempt to authorize magistrates to render Article III powers. Whether they should be Article III judges is a question for Congress—until, they are made so, we should not by judicial fiat perform that act.[4]

ARNOLD, Circuit Judge, joined by LAY, Chief Judge, and BOWMAN, Circuit Judge, dissenting in part.

This Court now joins the First, Second, Third, and Ninth Circuits in holding that Congress has not violated Article III by empowering United States Magistrates, with the consent of the parties, to enter judgments with the same force and effect as United States District Judges. In the face of this increasing weight of authority, it requires more than the normal amount of temerity to disagree. Nevertheless, because the issue seems to me so clear and simple, so basic to the whole theory of a written Constitution interpreted by independent judges, I respectfully dissent.

Article III, Section 1, provides:

The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Magistrates are appointed by the district courts for a term of years. They are not appointed by the President. They are not confirmed by the Senate. They do not hold office during good behavior. They have only a statute to protect their salaries, and even that protection is good only for the magistrate's current term. They are not, in short, protected from popular disaffection to the extent required by Article III for judges. Yet, the Court today holds that they may decide whether to enter judgment, and for whom, in this diversity case arising under the law of Missouri, a case that undeniably falls within the "judicial Power of the United States."

The reasoning employed to justify this result is an attempt to make a simple case complex. For whatever may be said about "adjuncts" of the district courts, however hopeful one may be that Congress will not in practice attempt to curtail the independence of magistrates, the fact remains that officers without Article III protection are exercising the judicial power in the most basic sense. They are deciding who should win cases, and entering judgments accordingly.[1] What need is there of any more United States District Judges, if this expedient is upheld?

I am not satisfied with the answer that all is cured by the parties' consent. Article III is concerned with more than fairness to the parties in any given case. It goes to the heart of our form of government, which is based in part on the conviction that there are some things that a majority of the people cannot do, and that cases should turn on the law, the facts, and the conscience of the judge, and on nothing else.

All of this is not to deprecate in any way the talent and diligence of our magistrates.

---

4. This statement is not an attempt to endorse vesting Article III status on magistrates or bankruptcy judges. Policy decisions such as this require congressional balancing of need, budgetary justification, etc. My point is simply that we should not judicially approve measures that do not comport with Article III.

1. The Magistrates Act is limited to civil cases, and even there does not include the contempt power. 28 U.S.C. § 636(e). But there is nothing in today's decision that would prevent Congress from assigning contempt proceedings and criminal cases also to magistrates. As the United States conceded at the oral argument in this case, Article III, Section 1, contains no language that would justify a distinction between civil diversity cases and prosecutions for federal felonies.

They do tremendous service in the cause of justice every day. (Indeed, perhaps they should be given Article III status, in which event the present issue would disappear.) But the facts of human nature, so well known and thoroughly distrusted by the Framers of our Constitution, require the conclusion that officers so exposed to outside pressure may be unduly tempted to avoid unpopular decisions. And if there is any lesson that is plain from our constitutional history, it is that judges who conscientiously apply a written Constitution are not always popular. It was Alexander Hamilton who said:

> The complete independence of the courts of justice is peculiarly essential in a limited constitution.

*The Federalist* No. 78, at 525 (Cooke ed. 1961).

Much has been written on both sides of this question. A fuller argument in this dissenting opinion would unduly cumber the pages of the reports. I content myself by referring the reader to Judge Schroeder's excellent dissenting opinion in *Pacemaker II*, 725 F.2d at 547–55.

I respectfully dissent.[2]

---

**2.** I agree with the Court's holding on the merits of this appeal, and join that portion of its opinion.