In re NANODATA COMPUTER CORPORATION f/k/a Nanodata Corporation, Debtor.

NANODATA COMPUTER CORPORATION,
Plaintiff,

v.

KOLLMORGEN CORPORATION,
Defendant.

Bankruptcy No. 82–11819 M.
AP–84–1007 M.

United States Bankruptcy Court,
W.D. New York.

Aug. 27, 1985.

Berger, Steingut, Weiner, Fox & Stern, New York City (Theodore S. Steingut, Kenneth G. Roberts, New York City, of counsel), Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y. (Garry M. Graber, Buffalo, N.Y. of counsel), for plaintiff.

Milgrim, Thomajan, Jacobs & Lee, P.C., New York City (Robert A. Meister, Lawrence I. Weinstein, New York City, of counsel), Aaron, Dautch, Sternberg & Lawson, Buffalo, N.Y. (William E. Lawson, Buffalo,

N.Y. of counsel), for defendant Kollmorgen Corp.

BERYL E. McGUIRE, Bankruptcy Judge.

The plaintiff, Nanodata Computer Corporation (hereinafter referred to as "plaintiff", "debtor" or "Nanodata"), seeks a determination by this Court that this adversary proceeding is a "core" proceeding under section 157(b), 28 U.S.C. and an order striking Kollmorgen Corporation's (hereinafter referred to as "defendant" or "Kollmorgen") first affirmative defense of lack of jurisdiction over the subject matter. The defendant, Kollmorgen, cross-moves for dismissal of this proceeding due to lack of subject matter jurisdiction or, alternatively, abstention and permission to withdraw its proof of claim.

I

BACKGROUND

Nanodata, a Delaware corporation with its principal place of business in Buffalo, New York, was formed in 1971 and began manufacturing and marketing digital computers and related products in 1973.

On June 18, 1982, Nanodata filed a petition for relief under Chapter 11 of the Bankruptcy Code. A disclosure statement and reorganization plan were filed on March 7, 1984. That plan, as amended, provided for distributions, beginning on a specified date after confirmation according to various terms of payment, to all seventeen classes of claims established in the plan. In addition, the plan proposed payment of 50% of any proceeds of this adversary proceeding to all Class 6 allowed general unsecured claims and a total of 15% of any such proceeds to Class 9 and Class 10

claims composed of interests in respect of Class A senior preferred stock and interests in respect of Class B senior preferred stock, respectively.

Following approval of Nanodata's disclosure statement, Space Circuits Limited (hereinafter referred to as "Space Circuits"), also a defendant in this adversary proceeding, filed the only objection to confirmation. By two Orders of this Court entered May 16, 1984, Space Circuits' objection was overruled and Nanodata's Second Modified Plan of Reorganization was confirmed.

Prior to confirmation, on November 1, 1982, Kollmorgen filed a proof of claim (claim # 94) against the debtor alleging a debt owed of $40,661.40. Space Circuits, a licensee of Kollmorgen, filed a proof of claim (claim # 172) on April 21, 1983, for $97,606.30. Essentially, the claims stated that Nanodata was past due in paying for goods manufactured by each claimant and sold on account to the debtor.

Nanodata responded on January 13, 1984 by filing a complaint against Kollmorgen and Space Circuits seeking damages in excess of $10,000,000, together with punitive damages in like amount. On February 28, 1984, Nanodata filed objections to allowance of defendants' proofs of claim.[1] Debtor's objections incorporated the allegations of its complaint by reference and sought disallowance of defendants' claims on the basis of those allegations.[2]

An amended complaint was filed on December 28, 1984, adding 437492 Ontario Limited, Space Circuits' successor corporation, as a party-defendant. Default judgments were entered against Space Circuits and 437492 Ontario Limited on October 2, 1984 and February 7, 1985, respectively,

---

1. Pursuant to a stipulation between the parties which was approved by this Court on March 26, 1984, Nanodata's objection to Kollmorgen's claim has been adjourned pending a resolution of this adversary proceeding.

2. The complaint filed on January 13, 1984 asserted four causes of action against Kollmorgen and Space Circuits, individually, as follows:
    (i) breach of warranty;

(ii) breach of contract;
(iii) intentional misrepresentation; and
(iv) negligent misrepresentation.
Complaint, ¶¶ 47–82.
    In addition, Nanodata alleged a fifth cause of action against Kollmorgen based on negligent supervision of its licensee, Space Circuits. Complaint, ¶¶ 83–93.

due to their failure to plead or defend. Hence, Kollmorgen presently is the only party defending Nanodata's various causes of action in this adversary proceeding.[3]

The amended complaint contains five causes of action against Kollmorgen, namely:

   (i) breach of warranty,

   (ii) breach of contract,

   (iii) intentional misrepresentation,

   (iv) negligent misrepresentation, and

   (v) negligent supervision of its licensee.

Amended Complaint, ¶¶ 48–65 and 84–94. A review of its allegations is appropriate.

### A

These causes of action arise out of Kollmorgen's relationship to the debtor as a supplier of circuit boards and associated interconnection panels (hereinafter referred to as "back panels") which were used in manufacturing the QMX computer system, the second major computer system developed by Nanodata beginning in 1978. Circuit boards and back panels are integral parts of any computer, since they act as the "brain" of a computer system, performing a computer's logic, memory and arithmetic functions.[4] Amended Complaint, ¶ 7.

In producing circuit boards and back panels, Kollmorgen has developed a technology which competes with other existing technologies used to produce such components. Kollmorgen's manufacturing process uses a computer controlled machine to place fine insulated wires on circuit boards with a cover of other material, such as epoxy, to seal the board and fix the wires in place (hereinafter referred to as "Multiwire Technology"). Amended Complaint, ¶ 11.

After discussions with representatives of Kollmorgen, Nanodata agreed, in October, 1979, to employ circuit boards and back panels produced by Kollmorgen using Multiwire Technology (hereinafter referred to as "Multiwire Boards"). Amended Complaint ¶ 23. In selecting Multiwire Boards for the QMX computer, Nanodata alleges that it relied on representations made by Kollmorgen regarding the cost and engineering advantages associated with the use of Multiwire Technology, and defendant's ability to fulfill the debtor's volume, delivery and design requirements for Multiwire Boards. Amended Complaint, ¶ 14–23.

Nanodata contends that, despite such representations, it experienced design problems and delays with respect to the Multiwire Boards almost from the outset of its relationship with Kollmorgen. According to the debtor, such problems persisted although Kollmorgen made repeated assurances that all problems would be resolved. Nanodata asserts that it relied on such assurances in continuing to use the Multiwire Technology. Amended Complaint, ¶¶ 20–30.

In December, 1980, Nanodata agreed to use Kollmorgen's licensee, Space Circuits, as a back-up and alternative supplier in order to meet Nanodata's volume requirements and to help cure previous delays. Amended Complaint, ¶¶ 31–32. Nevertheless, the debtor alleges that problems continued and eventually worsened. Amended Complaint, ¶¶ 33–40.

During the entire period, Nanodata maintains that Kollmorgen and Space Circuits assured it that the problems could be resolved. Id. However, according to Nanodata, in December, 1981, after learning that Space Circuits had "seriously violated" Kollmorgen's specifications with respect to manufacturing the Multiwire Boards, it was clear that no solution would be forthcoming. Amended Complaint, ¶ 40.

In January, 1982, Nanodata ceased using the Multiwire Technology in producing the

---

**3.** Issue had been joined between Nanodata and Kollmorgen on Nanodata's initial complaint on April 10, 1984. Kollmorgen filed an answer to Nanodata's amended complaint on January 28, 1985.

**4.** The QMX computer system was designed to use up to 46 different circuit boards and a total of three back panels. Amended Complaint, ¶ 13.

QMX computer and began to retool in order to use a different technology. Amended Complaint ¶¶ 41–45. Finally, Nanodata alleges that, because of severe cash flow problems resulting from an inability to manufacture and sell QMX computers, it was forced to file for relief as a debtor. Amended Complaint, ¶ 46.

### B

Kollmorgen, in its answer to the amended complaint, denies the allegations which form the basis of Nanodata's causes of action, interposes a counterclaim and asserts, as the first of five affirmative defenses, that this Court lacks jurisdiction over the subject matter of such causes of action.[5]

Plaintiff's motions and defendant's cross motions were filed on April 23, 1985 and May 13, 1985, respectively. Memoranda of law have been submitted, and oral argument was heard on June 19, 1985. Decision was reserved.

### II

### ARGUMENT OF PARTIES

In support of its motion, Nanodata argues that this is a "core" proceeding pursuant to sections 157(b)(2)(C) and 157(b)(2)(O), Title 28 U.S.C. and, as such, section 157(b)(1) allows this Court to hear, determine and enter final judgment in the instant proceeding.

Kollmorgen, in turn, contends that the causes of action asserted by Nanodata are the same type at issue in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (hereinafter referred to as *"Marathon"*) where, in its view, the Court held that such actions must be adjudicated by an Article III Court. Hence, it argues that if Nanodata's contention is correct (i.e., that the proceeding is "core"), section 157 is unconstitutional under Article III and the Due Process Clause of the United States Constitution to the extent it allows this Court to hear and determine *Marathon* type actions over an objection by a party.

Kollmorgen urges this Court to avoid resolution of the constitutional question by construing section 157(b)(1) to require that two preconditions be met before a bankruptcy court may exercise subject matter jurisdiction; namely, that (i) the proceeding is a "core" proceeding, and (ii) such proceeding arises under or in a case under Title 11. According to Kollmorgen's argument, even assuming *arguendo* that Nanodata's actions are "core" proceedings, this Court may not hear and determine such actions, since they are merely "related" to a case under Title 11 and therefore, do not fulfill the second precondition to adjudication established in section 157(b)(1).

Additionally, Kollmorgen argues that no constitutional issue is presented, since this proceeding is not a "core" proceeding under section 157, subpart (b)(2)(C) or (b)(2)(O). In making this argument, the defendant asserts that Nanodata's causes of action do not constitute counterclaims, nor do these actions affect the adjustment of the debtor-creditor or equity security holder relationship as required by those subsections.

Arguing that section 157(b)(1) does not establish two preconditions to adjudication, Nanodata would have this Court address

---

**5.** In addition to the jurisdictional defense, Kollmorgen asserts that (i) the cause of action based on intentional and negligent misrepresentation should be dismissed because Nanodata did not plead the circumstances constituting fraud with particularity; (ii) Nanodata has waived its rights against Kollmorgen to any consequential damages suffered by Nanodata; (iii) the applicable statutes of limitation bar some of Nanodata's causes of action; and (iv) Nanodata's injuries were caused by its own negligence, or the negligence or improper acts of persons other than Kollmorgen. As a counterclaim and partial defense of setoff, Kollmorgen alleged that Nanodata owes the defendant $6,368.00 for goods sold and delivered, $700.00 for design changes and $34,293.40 for orders which Nanodata cancelled.

the constitutional question presented by Kollmorgen and resolve such question in the debtor's favor. Nanodata urges this Court to conclude that the 1984 amendments to Title 28 [6] comport with constitutional standards and cure the constitutional infirmities, enunciated by the Supreme Court in *Marathon.*

Finally, Kollmorgen argues that this Court should abstain and recommend abstention by the District Court pursuant to section 1334(c)(1), Title 28 U.S.C., for the following reasons: (i) Nanodata's actions are governed exclusively by state law, (ii) this proceeding is merely "related" to a case under Title 11, (iii) this proceeding could not have been commenced in federal court absent Nanodata's bankruptcy since there is no diversity, and (iv) Nanodata commenced an identical lawsuit in state court which can be timely adjudicated. In arguing for abstention, Kollmorgen in its briefing footnoted a contention that it would also be unconstitutional under Article III for the District Court to exercise jurisdiction over this proceeding since Nanodata's actions do not arise under the laws of the United States and no other jurisdictional predicate is present.

For the reasons set forth in the ensuing discussion, this Court finds it unnecessary to reach the constitutional challenges to this Court's authority, grants Kollmorgen's motion to withdraw its claim, recommends to the District Court that it abstain and declines to address the constitutional issue raised with respect to the District Court's jurisdiction.

## III

## DISCUSSION

### A

In part, the '84 amendments to the Bankruptcy Reform Act of 1978 are the Congressional response to the Supreme Court decision in *Marathon.* That decision, of course, held the jurisdictional grant of authority to the bankruptcy courts under the '78 Act to be overbroad and violative of Article III of the U.S. Constitution.

The '78 Act had passed the full jurisdictional authority of the district court over bankruptcy cases and proceedings through to the bankruptcy court.[7] That grant of authority to the district court included "original and exclusive jurisdiction of all cases under title 11," as well as "original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11." [8] In *Marathon,* the Supreme Court was not required to focus upon that mode of transfer in terms of the district court's initial authority over bankruptcy "cases", "proceedings arising under title 11" or proceedings "arising in ... cases under title 11." [9] Because of the nature of the proceeding at issue, it, rather, was required to address only the remainder of the grant of that authority; namely, over proceedings "related to cases under title 11." [10]

The basic response of Congress to this jurisdictional defect is found in section 1334 and section 157 of Title 28 U.S.C. Under section 1334, the jurisdictional grant to the district court remains the same.[11] However, the transfer of the district court's authority over bankruptcy cases and proceedings to the bankruptcy court initially is totally discretionary.[12] If reference au-

---

**6.** See The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333.

**7.** See former § 1471, Title 28 U.S.C. and more particularly subsection (c) thereof.

**8.** *See* former § 1471(a) and (b), Title 28 U.S.C.

**9.** The plurality opinion repeatedly refers to that aspect of the jurisdictional grant involving proceedings only "related" to a case under title 11. *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 54, 74, 76, 81, 85

and 87 n. 40, 102 S.Ct. 2858, 2862, 2873, 2874, 2876, 2878, 2880 n. 40, 73 L.Ed.2d 598 (1982). Justices Rehnquist and O'Connor concurred with such a focus. *Id.* at 91, 102 S.Ct. at 2881. *See also Thomas v. Union Carbide Agricultural Products Co.,* — U.S. —, —, 105 S.Ct. 3325, 3335, 87 L.Ed.2d 409 (1985).

**10.** *Id.*

**11.** Compare former § 1471(a) and (b) with § 1334(a) and (b).

**12.** *See* § 157(a), Title 28 U.S.C.

thority is fully transferred, the bankruptcy court, with minor exceptions,[13] continues to have the authority to address bankruptcy "cases" and "proceedings arising under title 11 or arising in a case under title 11." [14] As will be demonstrated, the bankruptcy courts, absent consent of the parties, may not be able to hear a "related" proceeding and in those instances in which they may, will only propose findings of fact and conclusions of law to the district courts.[15]

Further focus on section 157 and the *Marathon* decision itself is warranted. In interpreting the statute, this Court assumes that the Congress, in fashioning its response, was mindful not only of *Marathon's* teachings, but also of the Federal Magistrates Act [16] and of the Circuit Courts' decisions addressing similar concerns under that Act.[17] In the latter area, given sufficient district court controls, the Circuit Courts have found the express consent of parties to litigation to provide a sufficient, but indispensable, predicate to the exercise of Article III power by a non-Article III judicial officer.[18] It should be

noted that similar controls now have been embodied in the '84 Bankruptcy Act.[19]

Section 157, although labeled "Procedures", clearly delineates the authority of the bankruptcy courts.

Subdivision (a) permits the reference of bankruptcy cases and proceedings by the district court "to the bankruptcy judges for the district," i.e., to the bankruptcy courts.[20]

Subdivision (b) and (c) collectively define the powers and scope of the authority of the bankruptcy courts over bankruptcy "cases" and "proceedings" in the event of reference.

i

■ With certain exceptions, not here relevant, subdivision (b) governs matters which the bankruptcy courts may entertain and in which they may enter dispositive orders or judgments. Initially, carte blanche authority to "determine all cases under title 11" is granted. Next, similar authority is granted relative to proceedings labeled "core" [21] and defined as those "aris-

---

**13.** As basic an element as any in the bankruptcy process is the allowance and disallowance of claims. With respect to personal injury tort and wrongful death claims, the Congress in section 157(b) chose to insert a partial exclusion of that power vis-a-vis the bankruptcy courts and to reserve that authority to the district courts. It did so by labeling this area of exclusion "non-core", making it subject to a special abstention rule, and requiring district court action. *See* § 157(b)(2)(B), (b)(4), and (b)(5), Title 28 U.S.C.

The term "minor" in the text is accurate in an overall context but may seem inapt in districts feeling the crunch of asbestosis or other product liability litigation.

**14.** *See* § 157(b).

**15.** *See* § 157(c).

**16.** *See* § 636, 28 U.S.C.

**17.** *See Collins v. Foreman*, 729 F.2d 108 (2d Cir.1984), cert. denied, — U.S. —, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 753 F.2d 1029 (Fed.Cir.1985); *Fields v. Washington Metropolitan Area Transit Auth.*, 743 F.2d 890 (D.C.Cir.1984); *Goldstein v. Kelleher*, 728 F.2d 32 (1st Cir.1984), cert. denied, — U.S. —, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *Puryear v. Ede's Ltd.*, 731 F.2d 1153 (5th Cir.1984); *Geras*

*v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037 (7th Cir.1984); *Lehman Bros. Kuhn Loeb Inc. v. Clark Oil & Refining Corp.*, 739 F.2d 1313 (8th Cir.1984) (en banc), cert. denied, — U.S. —, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc.*, 725 F.2d 537 (9th Cir.1984) (en banc), rev'g 712 F.2d 1305 (9th Cir.1983), cert. denied, — U.S. —, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Wharton-Thomas v. United States*, 721 F.2d 922 (3rd Cir. 1983).

**18.** *Id.*

**19.** *See* § 157(a), (b)(3), (b)(5), (c)(1), (c)(2), and (d).

**20.** *See* § 151, Title 28 U.S.C.

**21.** The term "core" was used in *Marathon's* plurality opinion to describe both basic federal bankruptcy power (458 U.S. at 71, 102 S.Ct. at 2871) and basic Art. III judicial power (458 U.S. at 70 and 71 n. 25, 102 S.Ct. at 2870, 2871 n. 25). It is clear that Congress, in section 157(b), chose to use that term not only in the former sense, but also as being inclusive of the federally created rights exception to the Art. III problem. (Discussed by the plurality, 458 U.S. at 83, 102 S.Ct. at 2877). The latter addition is made clear, for example, by Congress' reference to

ing under title 11, or arising in a case under title 11." [22] The mode of review of orders and judgments entered under this authority is by appeal under section 158, Title 28 U.S.C.

Subdivision (b)(2) of section 157 then contains a non-exclusive, descriptive listing of "core" proceedings. It is this Court's firm conviction that, although drafted in declaratory form, this subdivision is only descriptive of the types of matters which generally will arise under or arise in a case under title 11. That is to say, if a given proceeding is non-core in that it does not arise under or arise in a case under title 11 and, hence, is only "related", it does not become "core" simply because it is technically or arguably within a given (b)(2) description. For example, a *Marathon* type proceeding is not "core" under section 157(b)(2)(O) simply because it may be viewed as a proceeding "affecting the liquidation of the assets of the estate." More simply stated, (b)(2)'s listing must be read in light of (b)(1)'s definition of "core" proceedings. [23]

ii

Subdivision (c) of section 157 addresses specifically the handling of *Marathon* type litigation, that is, litigation not within (b)(1); subdivision (c) addresses litigation in which state created rights are at issue and in which such issues are not to be addressed and determined incident to the normal exercise of basic federal bankruptcy power. [24] In short, and in terms of the basic jurisdictional grant to the district court, subdivision (c) governs litigation which is only "related to a case under title 11." It is here that this Court is convinced that the Congress drew in part from experience under the Federal Magistrates Act. [25]

Subdivision (c)(1) permits a bankruptcy court to hear a "related", non-jury proceeding, but in doing so, it acts as little more than a fact-finder. It must forward its proposed findings of facts and conclusions of law to the district court for de novo review. It should be noted that this procedure [absent consent of the parties and district court approval in proceedings governed by (c)(2) and hereinafter discussed] is mandatory for all proceedings which are only "related to a case under title 11," the bankruptcy court being required in all instances, whether the issue is raised by a party or not, to determine if a proceeding is "core" or "non-core". [26] The non-jury limitation, of course, is implicit both in the concepts of bankruptcy court

preference and fraudulent conveyance litigation in section 157(b)(2)(F) and (H).

**22.** Kollmorgen argues that "core" proceedings do not necessarily arise under Title 11 or arise in a case under Title 11. This Court does not agree with such a construction of section 157. Obviously, the Congress did not intend to create a category of proceedings which the statute overall would leave in limbo, i.e. "core" proceedings which do not arise under or in a case under Title 11 but that are otherwise related to a case under Title 11; nowhere does section 157 address or provide treatment for a category of proceedings characterized as "core" and "related". *But see Norton and Lieb, Jurisdiction and Procedure Under the 1984 Bankruptcy Amendments* (Norton Bankr.L.Prac. Monograph 1985 No. 1) and see note 23, *infra.*

**23.** *See Mohawk Industries, Inc. v. Robinson Industries, Inc.,* 46 B.R. 464 (D.Mass.1985); *In re Atlas Automation, Inc.,* 42 B.R. 246 (Bankr.E.D. Mich.1984); *Cf. Norton and Lieb, supra* note 22,

at 101–128 (arguing that a "core" proceeding does not necessarily arise under or in a case under Title 11, and hence, although a proceeding may be a "core" proceeding under section 157(b)(2), such proceeding is outside the bankruptcy court's adjudicatory power if it is "related" to a case under Title 11).

*But see In re Lombard-Wall, Inc.,* 48 B.R. 986, 990–91 (S.D.N.Y.1985); *Macon Prestressed Concrete Co. v. Duke,* 46 B.R. 727, 730 (M.D.Ga. 1985); *In re Lion Capital Group,* 46 B.R. 850, 858–60 (Bankr.S.D.N.Y.1985); *In re Marketing Resources Intern. Corp.,* 43 B.R. 71, 72 (Bankr.E. D.Pa.1984).

**24.** *See* § 157(b)(3) emphasizing that a "determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by state law."

**25.** *See* note 16, *supra.*

**26.** *See* § 157(b)(3).

fact-finding and district court de novo review.[27]

Subdivision (c)(2), on the other hand, permits dispositive judgments in the bankruptcy court given the consent of all the parties and, this Court would suggest, explicit approval of the district court. Here, interpretation by analogy in light of the provisions of section 636 of the Magistrates Act and Forms 33 and 34 of the Federal Rules of Civil Procedure is particularly compelling. Notwithstanding the general reference of authority of the district court in section 157(a), subdivision (c)(2) again refers to district court action but now coupled with the parties' consent. While not necessary to decision in this proceeding, this phraseology suggests the need for explicit district court approval quite apart from any general reference order entered pursuant to section 157(a).

Subdivision (d) completes district court control over cases and proceedings by providing the mechanisms for the withdrawal of matters from the bankruptcy court to the district court.

B

In the proceeding at hand, whether the dispute between Nanodata and Kollmorgen is viewed as a straightforward adversary proceeding instituted by Nanodata[28] or as an adversary proceeding stemming from Nanodata's counterclaim to Kollmorgen's filing of its proof of claim,[29] it is not necessary to define the precise perimeters of this Court's jurisdiction. The causes of action of Nanodata clearly are not "core" matters but raise state issues within *Marathon's* proscription and hence, are merely "related" and governed by section 157(c).[30]

As noted earlier, Nanodata argues that because Kollmorgen has filed a claim, its litigation is literally within the provisions of section 157(b)(2)(C) which describes as "core", "counterclaims by the estate against persons filing claims against the estate." To be within that subpart, however, the dispute first must be a "core" proceeding as that term is used in section 157(b)(1); that is to say, it must arise under or arise in a case under Title 11. Nanodata's litigation does not. In so concluding, this Court necessarily rejects Nanodata's argument that its litigation was pivotal to its reorganization plan and, therefore, should be viewed differently. Quite to the contrary, in this Court's view, the linchpin to deciding whether a cause of action arises under Title 11 or arises in a case under Title 11 is the underlying nature of the cause of action itself and not merely the importance of that cause of action to the debtor or its creditors.

Nanodata legitimately argues, however, that Congress in subpart (b)(2)(C) may have intended to include this type of litigation under the rationale of the Supreme Court's decision in *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). In considering the argument, it initially must be pointed out that reservations about the constitutionality of the *Katchen* decision were noted by the plurality in the *Marathon* case.[31] Moreover, to accept the argument would be to deny the overall symmetry which this Court is convinced Congress intended between subsections (b) and (c) of section 157. Finally, such jurisdiction by ambush would seem fundamentally incompatible with the constitutional precepts in-

---

**27.** *See Ford v. Estelle,* 740 F.2d 374 (5th Cir. 1984) (Magistrates Act).

**28.** *See* Bankr.Rule 7001(1).

**29.** *See* Bankr.Rule 3007 (and the Advisory Committee Note thereto) which treats an affirmative demand for relief in an objection to a creditor's claim as a counterclaim to such creditor's claim. This, in essence, is what Nanodata, by initiating this adversary proceeding and subsequently filing an objection to Kollmorgen's proof of claim,

which incorporated by reference the complaint herein, has sought to do.

**30.** This proceeding raises only state law rights. It does not involve the resolution of a bankruptcy issue merely affected by state law. *See* § 157(b)(3) and text accompanying note 24, *supra.*

**31.** *See Marathon,* 458 U.S. at 79 n. 31, 102 S.Ct. at 2876 n. 31.

volved.[32] This is not to say that jurisdiction necessarily would be lacking, at least under section 157(c)(1), if Kollmorgen continued to press its claim against this estate.[33]

Kollmorgen has objected to this Court's jurisdiction, and asserted its preference for a jury trial in a state tribunal. Since state judges also lack Article III protections, the defendant's position might be characterized as a transparent effort to delay. Nonetheless, its position clearly is countenanced under existing law, and given a timely jury demand, does not permit proceeding in this Court under either subdivision (c)(1) or (c)(2) of section 157.

■■■■■ The Court concludes: 1) Nanodata's adversary proceeding and/or counterclaim to Kollmorgen's claim is not a "core" but a "related" proceeding governed by section 157(c) and may not be heard by this Court under section 157(c)(1) because of the parties' demand for a jury, and 2) because of Kollmorgen's position vis-a-vis jurisdiction, it is appropriate to grant its motion to withdraw its proof of claim.[34] The Clerk, therefore, is directed to forward this adversary proceeding to the District Court for inclusion on its docket.

■■■■■■ In light of the foregoing, there remains to be addressed only Kollmorgen's motion for abstention. There is some difference of opinion as to whether or not a bankruptcy court may address this issue under a general reference order entered pursuant to section 157(c) in light of specific references to the district court in section 1334(c)(1), 28 U.S.C. Because this adversary proceeding is being transferred to the docket of the District Court, this Court views it as inappropriate to pass upon the motion and elects, rather, merely to note its recommendation to the District Court. Because the debtor's reorganization plan has been confirmed and its reorganization case, for all intents and purposes, is nearly complete, this Court would view the relationship of the reorganization case to this adversary proceeding to be too attenuated to warrant further federal involvement. It, therefore, would recommend abstention.

It is So Ordered and Recommended.

---

**32.** *See Schor v. Commodity Futures Trading Comm'n,* 740 F.2d 1262, 1275–77 (D.C.Cir.1984) (Commodity Exchange Act); 1616 *Reminc Ltd. Partnership v. Atchison & Keller Co.,* 704 F.2d 1313, 1318 (4th Cir.1983); *Norton and Lieb, supra* note 22, at 110–16 and 150–62. *But see Lombard-Wall,* 48 B.R. at 992; *In re Frank Depo,* 40 B.R. 537, 542 (N.D.N.Y.1984).

**33.** While Nanodata urges that it is too late in the day for Kollmorgen to seek to withdraw its claim and further, that Bankr.Rule 3006, the Advisory Committee Note thereto and Rule 41(a) Fed.R.Civ.P. do not permit such withdrawal, the unsettled state of the law in this jurisdictional area at the time that the proof of claim was filed, and indeed, at this time, militates against a timeliness argument, and application of the Rules relied upon must be tempered by the constitutional principles involved.

**34.** *See* note 33, *supra.*