WULLSCHLEGER & CO.,
INC., Plaintiff,

v.

JENNY FASHIONS, INC., Defendant.

No. 84 Civ. 3449 (LFM).

United States District Court,
S.D. New York.

Sept. 25, 1985.

Carter, Ledyard & Milburn by Louis L. Stanton and John A. Maher, New York City, for plaintiff.

Ruben, Schwartz & Schnall by Robert S. Arbeit, New York City, for defendant.

## OPINION

MacMAHON, District Judge.

This is an action by a seller, Wullschleger & Co., Inc., against a buyer, Jenny Fashions, Inc. (Jenny), for nonpayment of $28,965.64, plus interest, for fabric sold and partially delivered to Jenny. Claiming a latent defect in the fabric, Jenny counterclaims for lost profits in the amount of $67,361.94, plus interest, alleging breach of both an express and an implied warranty of merchantability.[1]

A bench trial was held on April 15 and 16, 1985. After carefully considering the exhibits, hearing and observing the witnesses, and weighing all the evidence and the arguments of counsel, we find the following facts:

## FACTS

Plaintiff, a North Carolina corporation with its principal place of business in that state, converts unfinished cloth to a finished state which it sells to garment manufacturers. Jenny, a New York corporation with its principal place of business in New York City, sells women's dresses made for it by contract sewing manufacturers. We have diversity jurisdiction.[2]

In September 1983, David Pearl (Pearl), Jenny's piece goods buyer, ordered a sample of six yards of light-weight polyester/rayon woven fabric, style 6697, from plaintiff. Aaron Talbert (Talbert), plaintiff's salesman, expressly represented that the fabric was "first quality" under industry standards. Talbert knew that Jenny intended to use the fabric to manufacture women's dresses but did not know the particular pattern or style Jenny intended to make.

Jenny, through its contractors, made the sample yardage into dresses having "circle" skirts, which are shaped by cutting the fabric in a semi-circular pattern and sewing the edges together in one seam. There was no apparent problem with the skirts, so Jenny decided to buy a large quantity of the fabric and make four styles of such dresses which it offered for sale to its customers.

Jenny's customers placed orders for the dresses, and to fill them Jenny bought 37,500 yards of the fabric from plaintiff during the period from October 13, 1983 to January 4, 1984. However, only 23,577 yards were delivered, at a price of $27,107.81, for which Jenny paid $11,402.94, leaving an unpaid balance of $14,704.87.

Jenny, upon receipt, visually inspected the fabric for quantity and quality by placing samples on a measuregraph, an illuminated examining machine, and again no visible physical defects appeared. The invoices delivered with the fabric disclaimed: "No claims allowed after 10 days," and "no allowance will be made after the goods have been cut."

Jenny began cutting the fabric in December 1983 and ultimately received 5,078 completed dresses from its sewing contractors. In mid-January 1984, however, Jenny discovered that the hems of the circle skirts were distorted in that the bottom hem elongated as much as six inches from its original position when the skirts were pressed on a Hoffman press, a flat bed press with automatic steam heat. Unable to ascertain the cause of the distortion and suspecting defective fabric, Jenny attempted to purchase substitute fabric from three different mills, but none of the available fabric was suitable. Meanwhile, some of Jenny's customers, who were dissatisfied with the dis-

---

1. N.Y. UCC §§ 2–313, 2–314 (McKinney 1964).   2. 28 U.S.C. § 1332.

tortion, had cancelled their orders, and, for the same reason, Jenny cancelled the majority of its remaining orders after notifying plaintiff of the distortion problem and the resulting cancellations.

In April 1984, Jenny's textile expert, Gerald M. Varley (Varley), inspected the fabric and found that a large portion was "skewed," *i.e.*, its warp (vertical) and filling (horizontal) yarns were not at right angles to each other. Plaintiff admits that some of the fabric was skewed and therefore not of "first quality." Nevertheless, it disclaims liability, asserting that the distortion was caused not by the skew, but by Jenny's misuse of the fabric.

## DISCUSSION

### Breach of Warranty

A warranty of merchantability of goods is implied in every sale where the seller is a merchant of goods of that kind.[3] Thus, plaintiff, a merchant of fabric, impliedly warranted to Jenny that the fabric was reasonably fit for ordinary purposes and was at least of a medium quality of goodness.[4] In addition, the statement of plaintiff's salesman, Talbert, that the fabric was "first quality" in accordance with industry standards is an express warranty as to the condition of the fabric.[5] Jenny reasonably relied on this representation in purchasing the fabric from plaintiff.[6]

Plaintiff's textile expert, Richard E. Kimble (Kimble), and Jenny's expert, Varley, both testified that they performed industry-established tests, which showed that the fabric was skewed and therefore not of "first quality."[7] Despite this admitted defect, plaintiff contends that the fabric was still merchantable because it could have been used safely for straight panel skirts. We reject this argument.

Plaintiff certainly knew that circle skirts are an ordinary garment in the industry and that one of the ordinary uses of fabric sold to dress manufacturers was for that purpose. It therefore impliedly warranted that the fabric was suitable for making circle skirts. Moreover, Varley testified that, if not skewed, this fabric would have been suitable for that ordinary purpose, and Jenny's sewing contractors had previously cut fabric in this same semi-circular pattern and the fabric had not distorted.

Plaintiff also argues that the skew was discoverable through reasonable physical inspection, and that Jenny, therefore, should be charged with constructive notice of the defect.[8] The practice in the industry, however, is that the supplier, not the purchaser, of fabric inspects for defects such as skewing. Although Jenny's employees inspected the fabric under the fluorescent light of a measuregraph, they were looking for obvious surface defects, not subtle off-filling defects. The surface nubs on the fabric, created by the rayon,

---

**3.** N.Y. UCC § 2–314.

**4.** *Nassau Suffolk White Trucks, Inc. v. Twin County Transit Mix Corp.*, 62 A.D.2d 982, 403 N.Y.S.2d 322 (2d Dept.1978).

**5.** N.Y. UCC § 2–313; *Kates Millinery, Ltd. v. Benay-Albee Corp.*, 144 Misc.2d 230, 450 N.Y. S.2d 975 (Civ.Ct. Queens Co.1982), *aff'd*, 120 Misc.2d 429, 467 N.Y.S.2d 348 (N.Y.App.Term 1983).

**6.** *Holdridge v. Heyer-Schulte Corp. of Santa Barbara*, 440 F.Supp. 1088 (N.D.N.Y.1977).

**7.** Varley performed three tests on ten different pieces of fabric taken from Jenny's warehouse: (1) the American Society of Testing & Materials skew test; (2) the American Association of Tex-

tile Chemists dimensional stability test; and (3) a skirt panel distortion test. The relevant tests for us are the skew and distortion tests.

The skew test showed that all of the fabric tested was skewed, and that the extent of skew ranged from %2.84 to %35.43. The maximum skew accepted in the industry for first quality fabric is %2.5. The majority of pieces of fabric, therefore, far exceeded the industry tolerance and clearly were not first quality.

The distortion test showed that the hems of the circle skirts, made with the fabric, pressed with a Hoffman press and hung for several hours, exhibited elongation. The hems of the outer panels of the skirts, where the distortion was the greatest, stretched from 3¼″ to 7″.

**8.** N.Y. UCC § 2–314; *McCormack v. Lynn Imports, Inc.*, 114 Misc.2d 905, 452 N.Y.S.2d 821 (Dist.Ct. Nassau Co.1982).

virtually covered the entire fabric and concealed the skew from the untrained eye.

We find, therefore, that the skew was a latent defect not discoverable through reasonable physical inspection.[9] Consequently, the disclaimers in plaintiff's invoices do not effectively relieve its liability for breach of warranty for selling defective goods.[10]

*Causation*

■ To prevail in an action for breach of warranty, the buyer must establish not only that a warranty has been breached, but also that the breach was the proximate cause of the loss sustained.[11] We turn now to the critical question of whether the skew was the proximate cause of the distortion.

■ Varley testified that the skew developed during the final finishing process, when the fabric was placed on very fine needles and passed on chains through a heat chamber with a temperature in excess of 300° Fahrenheit.[12] One aim of this process is to orient the fabric back to its original position with warp and filling yarns at right angles. Once the fabric is heat set in a skewed position, however, it is under tremendous pressure to return to its normal 90° position. Varley opined that the heat and pressure from the Hoffman press relieved that stress, causing the yarns to move and distort the hems of the circle skirts.

Plaintiff contends that, since the temperature in the heat chamber was in excess of 300° and the temperature generated in the Hoffman press is only 240° to 250°, the press was not hot enough to cause the yarns to move. Although we recognize that this point has some validity, it is based on unsubstantiated evidence and, therefore, is too speculative to undermine Varley's opinion. There was no documented evidence of the actual temperature in the heat chamber at the time the fabric was finished. Furthermore, neither plaintiff's expert, nor a representative from the mill which performed the finishing process for plaintiff, testified as to the temperature in the chamber or the finishing process in general.[13]

Plaintiff also argues that Varley's skew and distortion tests fail to establish a causal connection between the skew and the distortion because the degree of skew did not vary proportionately with the degree of distortion. Varley explained, however, that the tests do not show such a direct correlation because the distortion test was conducted on the fabric vertically, whereas the skew test was conducted horizontally.[14] Moreover, the degree of skew varied not only with different pieces of fabric, but also within the pieces themselves; therefore, it is very difficult to establish an exact and direct relationship between degree of skew and amount of distortion. The fact remains that there was a high degree of skew in the fabric, that Varley testified that the skew caused the fabric to stretch, and that the fabric stretched to such a degree that it was not merchantable.

9. *Cf. Parente v. Bayville Marine, Inc.,* 43 A.D.2d 956, 353 N.Y.S.2d 24 (2d Dept.1974).

10. N.Y. U.C.C. § 2–316(3)(b).

11. Official Comment 13 to N.Y. U.C.C. § 2–314.

12. The purpose of the finishing process is to stabilize the fabric to a specific width and to prevent future shrinkage in excess of 3°. Varley testified that skewing is frequently caused because the fabric is not evenly placed on the pins, or the chains on either side of the fabric are not properly synchronized.

13. Furthermore, Varley testified that under normal fabric construction conditions, fabric heat set at 300° would not be altered by a temperature lower than 300°. However, there was no expert testimony concerning the temperature required to move abnormally constructed or skewed fabric. Moreover, Varley testified that his tests indicated that the temperature in the heat chamber was below 300°.

14. Therefore, for example, where the majority of the skew occurred only at the top end of the fabric, it is possible that the garment panel would evidence little or no distortion at its hem. On the other hand, if the skew went across the entire piece of fabric, the panel would exhibit distortion.

Plaintiff contends that the skew could not have been the cause of the distortion because Kimble tested skirts made of both skewed and non-skewed fabric and found that both distorted when pressed. Although Kimble tested plaintiff's style 6697 fabric, it was not fabric taken from Jenny's warehouse. There is no way, therefore, to determine whether the fabric he tested was finished at the same time as the fabric Jenny received. Since the evidence indicates that Jenny's fabric was skewed when it was misaligned on pins and drawn through a heat chamber during the finishing process, the tests Kimble performed on fabric which may have been finished at a different time, under different conditions, are neither relevant nor conclusive as to the fabric Jenny received.

Finally, plaintiff argues that Jenny should neither have used this lightweight woven fabric for circle skirts, nor pressed it with a Hoffman press. The distortion occurred, argues plaintiff, because the fabric was cut along the bias and then pressed. According to accepted textile terminology, however, these circle skirts were not cut on the bias because they were not cut on a 45° angle.[15] The cut along the circumference of the semi-circle, which intercepts the right angles of the warp and filling yarns, is not a cut on the bias, but rather is a "gravity bias," which is the inevitable result of cutting a plain fabric to form a garment.[16]

Plaintiff's suggestion that Jenny should have pressed these skirts on a "Suzy Q," a canvas dress form inflated with steam, instead of on a Hoffman press, is unfounded. A "Suzy Q" is used for delicate garments, such as bridal gowns, to remove wrinkles and to relax a garment from the inside out. Varley testified that he had never heard of its use on circle skirts. Moreover, plaintiff's own invoices stated that the fabric could be ironed.

We find, therefore, that Jenny's use of a Hoffman press was reasonably foreseeable, and accordingly conclude that the skew in the fabric was the proximate cause of the distortion in the circle skirts. We turn now to the question of damages.

*Damages*

Section 2–715(2)(a), N.Y. UCC (McKinney 1964), provides that a buyer may collect consequential damages resulting from a seller's breach of warranty for "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise...." Plaintiff contends that it did not have "reason to know" that Jenny would use its fabric for circle skirts, and therefore that it is not liable for Jenny's lost profits.

This entire argument hinges on the allegation that Jenny should have known that plaintiff's fabric was not suitable for circle skirts, and therefore that Jenny's decision to cut it for circle skirts was effectively a misuse of the fabric.[17] We find that this contention is simply not supported by the weight of the evidence.

Varley testified that the fabric was suitable for circle skirts. Moreover, circle skirts are neither unusual in the industry nor unique in any way. On the contrary, the making of such a skirt by a dress manufacturer is an ordinary use of fabric well within the inferred knowledge of the seller.

---

15. "Bias" is a condition in woven fabric where the warp and filling yarns do not meet at right angles. Fabric cut on the bias is likely to stretch because in the bias area only one end of the yarn is being pulled, rather than both ends. The original patterns and markers used indicated that all the skirt panels were cut at right angles to the edge of the fabric. The fact that the circle skirt panels were 77″ in length and 39½″ at the widest point made bias cutting on the 56″/60″ wide fabric impossible.

16. In using a plain fabric to make a circle skirt, the manufacturer knows that no two people have the same diameter of waist or contour of hip; therefore, "gravity bias" causes an uneven length to the hem of the skirt. Jenny compensated for this bias by making an adjustment in the marker which is the standard industry practice.

17. *Cf. Anglo-Eastern Bulkships Ltd. v. Ameron, Inc.*, 556 F.Supp. 1198, 1205 (S.D.N.Y.1982).

The fact that Jenny never specifically told plaintiff that it intended to make circle skirts is not determinative, for only those needs of the buyer which are particular must be made known to the seller.[18] Jenny's loss could not "reasonably be prevented by cover or otherwise." Its attempts to cover by purchasing substitute fabric, although unsuccessful, were reasonable and made in good faith.

We find, therefore, that pursuant to N.Y. UCC § 2–715 Jenny is entitled to recover its lost profits resulting from the distortion of the skirts, because plaintiff had reason to know of Jenny's intended use and Jenny made reasonable efforts to prevent its loss.[19]

Plaintiff contends that Jenny's basis for computing lost profits is too uncertain to warrant relief. Pursuant to New York law, however, "[w]hen it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for refusing on account of such uncertainty, any damages whatever for the breach."[20] Where a wrong has been done, the court will make a reasonable attempt to estimate damages.[21]

In essence, Jenny seeks lost profits resulting from the cancellation of purchase orders for dresses to be made with plaintiff's fabric. Jenny limits its claim to those purchase orders received through the end of January 1984, when it discovered that the fabric was defective.[22] Two of the cancellations—one from Sears, Roebuck &

Co. and one from Montgomery Ward— were documented. Pearl testified that the remaining purchase orders were cancelled by Jenny on the telephone. Six of these orders, received from Conston, Imperial Buyers, Ltd., Charming Shoppes, Cato Corp., Miller-Wohl Co., Inc. and Sizes Unlimited, were documented and admitted into evidence.

■ Jenny had no effective bookkeeping system, however, so entries on its style sheets are the only evidence of any other orders. These sheets are not only illegible, but also somewhat contradictory. Pearl could not testify as to who made the entries, nor when they were made. We are compelled to conclude that these sheets are not a reliable basis for establishing the amount of undocumented purchase orders.

■ We, therefore, find that on the basis of (1) the two cancellations received from Jenny's customers, and (2) the six purchase orders cancelled by Jenny on the telephone, that Jenny would have received $82,155.50 in gross profits[23] if plaintiff's fabric had not been defective. (See Appendix attached.) We deduct from this amount (1) the $20,346.05 which Jenny recouped at close-out sales for defective dresses, (2) the $9,039.25 estimated labor rebate for unsewn dresses,[24] and (3) the $15,704.87 balance due on fabric plaintiff delivered to Jenny, which leaves net lost profits in the amount of $37,065.33. (See Appendix attached.)

---

**18.** Official Comment 3 to N.Y. UCC § 2–715.

**19.** *Lake Steel Erection, Inc. v. Egan,* 61 A.D.2d 1125, 403 N.Y.S.2d 387 (4th Dept.), *appeal dismissed,* 44 N.Y.2d 848, 406 N.Y.S.2d 761, 378 N.E.2d 124 (1978).

**20.** *Lexington Products, Ltd. v. B.D. Communications, Inc.,* 677 F.2d 251, 253 (2d Cir.1982), *quoting Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N.Y. 205, 209, 4 N.E. 264, 206 (1886).

**21.** *Id. See also Manniello v. Dea,* 92 A.D.2d 426, 461 N.Y.S.2d 582 (3d Dept.1983).

**22.** Jenny cannot seek to collect for the cancellation of orders which were received after it was

on notice of the defect in the fabric, for the damages incurred as a result of those cancellations do not proximately result from the breach of warranty. Official Comment 5 to N.Y. UCC § 2–715 (McKinney 1964).

**23.** Jenny requests lost profits of $4.78 per dress for 1,576 dresses which were never made and for which there were no orders. This request is denied because Jenny has not substantiated a profit of $4.78 per dress, nor has it demonstrated that these dresses would have been sold.

**24.** Jenny computed a labor rebate of $11,299.75 based on 4,109 unsewn dresses. This amount is reduced by 20% to reflect the fact that Jenny requested damages on a total of 7,648 dresses and we granted damages on only 6,172 dresses.

Pursuant to New York law, Jenny is also entitled to interest on this award which "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."[25]

■ This action existed as of the date Jenny sustained damages due to the cancellation of purchase orders.[26] The testimony, however, failed to establish what dates the various orders were cancelled. The rule in New York is that, when it is impossible to determine when damages actually were in-

curred, pre-verdict interest is computed from the commencement of the action.[27] Jenny is therefore entitled to interest at a rate of nine (9%) per cent per annum, from May 16, 1984, the date of the commencement of this action, to the date of this opinion.

The foregoing constitutes our findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ.P.

Accordingly, the Clerk of the court is directed to enter judgment dismissing plaintiff's action in all respects, and granting defendant judgment on its breach of warranty claim in the amount of $37,065.33, plus interest at a rate of nine (9%) per cent per annum, from May 16, 1984 to the date of this opinion, together with all costs of this action.

### APPENDIX

#### Damages—Lost Profits

Documented Cancellations (for orders placed through 2/84 for 3,995 dresses totalling $55,741.00):

Sears, Roebuck & Co.
Cancellation dated 2/7/84 for orders dated 1/25/84 for 1,700 dresses
(Style 210), at $12.00 ea., and for 1,700 dresses (Style 220), at $13.50 ea.:  $43,350.00

Montgomery Ward
Cancellation dated 2/24/84 for orders dated 2/8/83 for 294 dresses (Style
2220), at $14.50 ea., and for 301 dresses (Style 2210), at $13.50 ea.:  8,327.00

Documented Orders cancelled by Jenny:

Conston
12/4/83 for 300 dresses (Style 220), at $14.50 ea.:  4,350.00

Imperial Buyers Ltd.
12/7/83 order for 576 dresses (Style 2220), at $14.50 ea., and for 283
dresses (Style 2210), at $13.50 ea.:  12,172.50

Charming Shoppes
12/15/83 order for 250 dresses (Style 2220), at $15.00 ea.:  3,750.00

Cato Corp.
12/19/83 order for 300 dresses (Style 210), at $12.50 ea.:  3,750.00

Miller-Wohl Co., Inc.
12/20/83 order for 300 dresses (Style 220), at $13.40 ea.:  4,020.00

Sizes Unlimited
1/10/84 order for 168 dresses (Style 2220), at $14.50 ea.:  2,436.00

Total Gross Profits:  $82,155.50

25. N.Y. CPLR § 5001(a), (b) (McKinney 1963).

26. *Cohen v. Bratt & Doxey Supply Co.,* 51 A.D.2d 719, 379 N.Y.S.2d 155 (2d Dept.), *motion to appeal denied,* 39 N.Y.2d 706, 385 N.Y.S.2d 1025, 351 N.E.2d 437 (1976).

27. *Morse v. Swank, Inc.,* 520 F.Supp. 829 (S.D.N.Y.1981); *Marx & Co. v. Diners' Club, Inc.,* 405 F.Supp. 1 (S.D.N.Y.1975).

Deductions:

  Dresses (all styles) sold in close-out sales:          $20,346.05

  Labor Rebate
3,287 unsewn dresses to be manufactured at a labor cost of $2.75 ea.:    9,039.25

  Unpaid Fabric
Wullschleger delivered 23,577 yards in three orders dated 10/13/83, 12/5/83 and 12/28/83; Jenny paid $11,402.94 for the first order, leaving a net unpaid balance:        15,704.87

                         Total Deductions:      45,090.17

              TOTAL NET LOST PROFITS:     $37,065.33