In re FIRST HARTFORD CORPORA-
TION d/b/a Wyandotte Mills, Debtor.

WYANDOTTE INDUSTRIES, DIVISION
OF FIRST HARTFORD
CORPORATION, Plaintiff,

v.

E.Y. NEILL & COMPANY, Defendant.

Bankruptcy No. 81 B 10390 (TLB).
Adv. 82–5456A.

United States Bankruptcy Court,
S.D. New York.

July 28, 1986.

See also, Bkrtcy., 46 B.R. 390, Bkrtcy.,
32 B.R. 56, Bkrtcy., 25 B.R. 234.

Bandler & Kass, New York City, for debtor; by Iris S. Richman.

Warner & Stackpole, Boston, Mass., for E.Y. Neill & Co.; by Charles N. Trippe, Jr.

Morgan, Lewis & Bockius, New York City, for E.Y. Neill & Co.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TINA L. BROZMAN, Bankruptcy Judge.

First Hartford Corporation ("FHC"), the plaintiff and debtor in possession, commenced an adversary proceeding against E.Y. Neill & Company ("E.Y. Neill") seeking damages caused by the claimed late delivery of allegedly unmerchantable fine super Australian scoured lamb's wool. De-

fendant urges that the wool was not delivered late, that it was in fact merchantable and that, in any event, FHC cannot prevail because of its failure to notify E.Y. Neill of the alleged unmerchantability within a reasonable period of time. Defendant also challenges the subject matter and personal jurisdiction of this court.

Defendant argues that FHC's complaint must be dismissed because the bankruptcy court lacks subject matter jurisdiction over state law claims for breach of contract and breach of warranty. Defendant urges that the legislative response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (*"Marathon"*), in which a plurality of the Court held unconstitutional the broad grant of jurisdiction to the bankruptcy courts to adjudicate state law breach of contract and warranty claims under former 28 U.S.C. § 1471 (1976 ed., Supp. IV), is itself unconstitutional.[1] Because we find that this adversary proceeding is a related one which can be finally adjudicated only by the district court, we need not determine the constitutional reach of this court's jurisdiction. *See Nanodata Computer Corporation v. Kollmorgen Corporation (In re Nanodata Computer Corporation)*, 52 B.R. 334 (Bankr.W.D.N.Y.1985); *see generally* L. King, *Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984*, 38 Vand.L.Rev. 675, 686–89 (1985) (hereinafter, "King").

The Congressional solution to *Marathon*, the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), Pub.L. No. 98–353 (1984), permits bankruptcy judges pursuant to section 157(b)(1), 28 U.S.C. § 157(b)(1), to hear and enter final orders in all cases under title 11 and in all "core" proceedings (which necessarily arise in or under the bankruptcy case), subject to traditional appellate review under 28 U.S.C. § 158. *Manville Corporation v. The Equity Security Holders' Committee (In re Johns-Manville Corporation)*, 60 B.R. 842, 848 & n. 18 (S.D.N.Y.1986); *Nanodata*, 52 B.R. at 441 n. 22. Pursuant to 28 U.S.C. § 157(c), bankruptcy judges may also hear, but not determine, "non-core" proceedings related to a case under title 11; unless the parties consent to entry of a final order by the bankruptcy judge, the judge will submit proposed findings of fact and conclusions of law to the district court. *Manville, supra*, 60 B.R. at 848.

In our view, the district court is clearly vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1334 to hear FHC's action against E.Y. Neill, a civil proceeding related to a case under title 11. Although FHC would have us determine that its action for damages is a "core" proceeding in that it affects the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship, we reject FHC's contention that an action for breach of contract and breach of warranty, precisely the type of action involved in *Marathon*, is included within the ambit of "core" proceedings, notwithstanding the undeniably broad definition of that phrase. *See Manville, supra*, 60 B.R. at 848–49; King, 38 Vand.L.Rev. at 686–89. Whereas the definition of a core proceeding includes no fewer than four catch-all phrases which could be interpreted to encompass the type of action at issue in *Marathon*, the constitutionality of a statute is to be presumed; thus we do not believe that the definition should be read in the fashion proposed by FHC. *See Nanodata*, 52 B.R. at 342; *Mo-*

---

1. As to the scope of the holding in *Marathon*, which has been much debated, see Justice O'Connor's dicta in *Thomas v. Union Carbide Agricultural Products Company*, — U.S. —, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), in which she stated:

 [t]he Court's most recent pronouncement on the meaning of Article III is [*Marathon*]. A divided Court was unable to agree on the precise scope and nature of Article III's limitations. The Court's holding in that case establishes only that *Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to appellate review. Id.* at 3334–35 (emphasis added) (citations omitted).

*hawk Industries, Inc. v. Robinson Industries, Inc.,* 46 B.R. 464 (D.Mass.1985); *Manville, supra,* 60 B.R. at 849; *but see Satelco Incorporated v. North American Publishers, Inc. (In re Satelco, Incorporated),* 58 B.R. 781 (Bankr.N.D.Tex.1986). Inasmuch as the district court is vested with jurisdiction to finally determine this adversary proceeding, we may, pursuant to 28 U.S.C. § 157(a) and the order of July 10, 1984 referring all cases and proceedings under title 11 to the bankruptcy judges of this district, propose findings of fact and conclusions of law without running afoul of the Constitution.

Trial was held on May 13, June 6 and June 7, 1985, FHC calling as witnesses an expert and three of its former officers. E.Y. Neill called its senior partner and a former officer of another company which eventually purchased and used most of the wool in question. After carefully considering the exhibits, hearing and observing the witnesses and weighing all the evidence and arguments of counsel, we propose the following facts.

## PROPOSED FINDINGS OF FACT

On February 20, 1981, FHC, a manufacturer and seller of finished textiles which operated a mill in Waterville, Maine, filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Code"). FHC was continued in possession of its property and operation of its business pursuant to sections 1107 and 1108 of the Code. E.Y. Neill, a wool merchant with 50 years' experience in the industry and almost 40 years' experience in the sale of Australian wools, Tr. at 359, is a Massachusetts partnership with its principal place of business in Boston, having no office, agent, mailing address or telephone listing in New York. Tr. at 351–52.

In late April, 1981, Eric Ullman ("Ullman"), FHC's vice president, and Stanley E. Neill ("Neill"), E.Y. Neill's senior partner, agreed during the course of a telephone conversation that E.Y. Neill would sell to FHC about 20,000 pounds of fine super Australian scoured lamb's wool at $4.12 per pound, as had. This was the final purchase of wool that FHC made from E.Y. Neill, with whom FHC had been dealing for many years. Tr. at 353–54.

FHC's purchase order indicates that half the wool was to be shipped in mid-July and that the other half was to be shipped in mid-August. Plaintiff's Exhibit 22. E.Y. Neill's confirmation disagrees with the delivery terms; it provides that half the wool was to be shipped "as soon as possible," that the remainder was to be shipped 3 weeks after the first shipment and that "[w]e will notify you shortly what ship the first 10,000 lbs. will be coming on." Plaintiff's Exhibit 23. This confirmation was accepted in writing by H. Peter Pearson, the vice president and general manager of FHC. Plaintiff's Exhibit 23. Although FHC steadfastly maintained that the delivery terms were agreed as set forth in its purchase order, the purchase order was not signed by E.Y. Neill and Ullman did not testify in rebuttal of Neill's testimony, which was both credible and congruent with the confirmation sent by E.Y. Neill to, and accepted by, FHC.

Neill testified that on April 29, 1981 he and Ullman had a telephone conversation during which Ullman expressed an interest in purchasing 20,000 pounds of Australian lamb's wool. Tr. at 355–56. When Neill informed Ullman that no shipping date could be guaranteed because of strikes in Australia, Ullman nevertheless urged Neill to communicate with his suppliers, which he did. Tr. at 356.

E.Y. Neill's principal supplier telexed an offer for the requested wool, indicating that a specific arrival date could not be guaranteed. Tr. at 356. Neill telephoned the offer to Ullman and read him the telex from the supplier. Tr. at 356–57. Ullman agreed to the purchase but asked Neill to confirm in writing that E.Y. Neill would endeavor to ship as soon as possible. Tr. at 357. Thus the confirmation so provided, further stating that "Seller shall not be liable in damages to buyers for any action or any other cause beyond seller's control, and the dates and quantities of deliveries

shall be modified to the extent necessitated by such causes." Plaintiff's Exhibit 23.

After this second conversation, Neill telexed his supplier, providing the requisite information and indicating that the wool was to be shipped as soon as possible. Tr. at 360. The supplier sent samples from the lot of wool to FHC and E.Y. Neill. Tr. at 382. Neill noted on his own sample that the mate had been sent to Ullman on June 3, 1981 and approved by Ullman on June 11, 1981. Tr. at 383.

■ The supplier advised E.Y. Neill that half the shipment would be sent on a ship estimated to arrive in Boston on July 16, and that the other half would be sent on a ship estimated to arrive in Boston on July 25. Tr. at 362–63. Thereafter, the supplier sent numerous telexes to Neill to apprise him of the status of the labor strikes. Tr. at 369–70; Defendant's Exhibit C.[2] Neill advised Ullman by letter in mid-June that, because of a container terminal strike, the first shipment of wool would instead be shipped aboard a later-departing ship; unfortunately, because of the strikes, that ship departed without the wool. Plaintiff's Exhibit 20; Tr. at 370; Defendant's Exhibits D, E & F.

During June, July and August of 1981, Neill spoke each week with either Ullman or Marcel Renny, FHC's former vice president of production, to keep them apprised of the shipping situation. Tr. at 377–78. Neither of them ever requested Neill to cancel the order or indicated that the wool was late. Tr. at 378. At the end of August, however, Renny called Neill and asked him to find another buyer because FHC was closing down its operations and had no further use for the wool. Tr. at 170–71. Neill testified that he agreed out of friendship to try to help FHC, but that he told Renny that the prospects were not bright because the market was depressed. Tr. at 393.

It was Renny who applied for the irrevocable letter of credit through which E.Y. Neill was ultimately paid for the wool. Tr.

2. E.Y. Neill sought the admission of a number of telexes, grouped as Defendant's Exhibit C, which purported to describe the strike-related delays encountered in shipping the wool. These telexes had been received by E.Y. Neill during the summer of 1981 from its Australian supplier. Although FHC initially consented to the admission of the telexes (Tr. at 365), plaintiff's counsel had a change of heart during a recess and moved to strike their admission on hearsay grounds (Tr. at 403–04). We denied plaintiff's motion, indicating that upon a review of all the evidence we would accord to Defendant's Exhibit C the weight to which it was due.

We now conclude that the telexes were properly admitted insofar as E.Y. Neill sought to prove that it was advised of the existence of strikes. But as to the truth of the matters asserted we conclude that they constitute hearsay pursuant to Fed.R.Evid. 801. Defendant's contention that the telexes fall within the purview of the business records exception of Fed.R.Evid. 803(6) is meritless because of defendant's failure to prove through the testimony of a qualified witness that the telexes emanated from a person with knowledge. Defendant's witness may have maintained these telexes from the supplier in the ordinary course of business, but the trustworthiness of the declarant, the supplier, was not established. *See, e.g., United States v. Ordonez,* 737 F.2d 793, 804–05 (9th Cir., 1984) (failure to lay reliability foundation); *Calhoun v. Baylor,* 646 F.2d 1158, 1162 (6th Cir.1981) (witness played no role in the creation or compilation of the records); *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 307 (5th Cir.1978) (authentication requirement not satisfied where witnesses testified that they had no knowledge of the source of the purported business records). Neither of the residual exceptions to the hearsay rule which can be used to admit a statement which is found to have guarantees of trustworthiness is available here because of defendant's failure to provide FHC with advance notice. *See* Fed.R.Evid. 803(24) and 804(b)(5).

Defendant nevertheless established the existence of pervasive strikes, including in the shipping industry, through its introduction into evidence of three articles culled from various periodicals (Defendant's Exhibits D, E & F). Two of these articles are photocopies, the third an original printout retrieved from Lexis/Nexis. They were admitted into evidence by this court as self-authenticating under the auspices of Fed.R.Evid. 902(6). The only objection raised by plaintiff was the best evidence rule, Fed.R.Evid. 1002. This court, however, finds that contention to be meritless in light of Fed.R.Evid. 1003 which provides an exception from the best evidence rule for duplicates.

We note, however, that even if the delay caused by the strikes is disregarded, delivery was timely since effected within the period contemplated by the parties, i.e., as soon as possible but no later than September 20, 1981.

at 159–60. The letter of credit application, executed by Renny, stated that one of the documents which defendant had to present to the bank in order to obtain payment under the letter of credit was a bill of lading which had to be "dated latest" September 20, 1981. Plaintiff's Exhibit 12. The irrevocable letter of credit issued by the bank on May 14, 1981 contained an expiration date of September 30 (as requested in Renny's application), as well as the following term: "Latest shipping date: September 20, 1981." Plaintiff's Exhibit 13.

The wool arrived in Boston on August 24th and, at the request of FHC, was shipped to a warehouse in Charlestown, Massachusetts, to be picked up by FHC's truck on August 25, 1981 or thereafter. Tr. at 378. FHC picked up the wool on September 2, 1981, even though the mill had been closed in August. Tr. at 169, 380.

Pearson inspected the 88 bales promptly, within ten days of their arrival, and found the wool to be unsatisfactory for FHC's intended French suede [3] style, because of an excessive amount of skin. Tr. at 218–19. Despite his conclusion that the wool was unsatisfactory, Pearson did not communicate his dissatisfaction to E.Y. Neill, Tr. at 226, but only to Renny and Ullman, Tr. at 254, neither of whom notified the seller of the claimed defect until almost five months after the wool's delivery. Moreover, Pearson approved payment to E.Y. Neill for the wool. Tr. at 250–51; Defendant's Exhibit G. No testimony was elicited to the effect that E.Y. Neill had been notified that FHC intended to manufacture that particular type of fabric with the wool.

There is no dispute that the wool was never returned to E.Y. Neill in Boston nor is there any evidence that FHC made any complaint to E.Y. Neill about the quality or the claimed late delivery of the wool until January 25, 1982. Tr. at 228, 379–80, 392. On that date, FHC's attorney sent a letter to E.Y. Neill demanding that it take back the wool and refund the purchase price. Defendant's Exhibit H. A clause in E.Y. Neill's confirmation of the order mandated that claims respecting the goods be made in writing within 30 days. Plaintiff's Exhibit 23.

Although Neill did not locate a buyer for the wool, FHC was more successful. In December 1981, it sold six of the 88 bales to Old Colony Textiles, Inc. ("Old Colony") for $3.45 per pound. Tr. at 172, 177 and 192. During his deposition, admitted into evidence, Old Colony's president, Frank J. Symosek, testified that he initially purchased four bales of the wool for its use by Jewell Brook Woolen Company. Defendant's Exhibit P at 7. After that mill complained to Symosek that the wool was not running properly, Symosek re-examined a sample, concluding that it contained too much skin. Id. at 12. He informed Renny that he would not exercise his option on the balance of the approximately 20,000 pounds. Id. at 13.

Thereafter, however, realizing that the skin could be removed if the wool were run through a "peralta," an implement which crushes hard matter, Symosek purchased an additional two bales and acquired an option on the balance of 82. Id. at 14–15. The second shipment was run through a peralta and "came out good." Id. at 19. When Symosek tried to exercise his option, he was informed by Renny that the balance of the wool had been sold to Jeffco Fibers ("Jeffco"). Id. at 20, 27–29. Symosek testified that he purchased the six bales of wool, which he examined before the sale, as fine Australian lamb's wool and, although he observed a little skin, considered the wool merchantable. Id. at 21–23.[4] In fact,

---

**3.** A sueded cloth is one in which the finished fabric is napped. The loose hairs are teased to the surface, rather than being sheared, giving the fabric a matte, soft finish. Tr. at 89, 132–33, and 216.

**4.** At the repeated urgings of Gerald Varley, FHC's expert, Symosek sent a letter to FHC dated January 21, 1982 (about two weeks after he received the second shipment) in which he stated that "we cannot use this lot where intended, as it contains an excessive amount of skin pieces that show up in the yarn." Defendant's

he attempted, unsuccessfully, to purchase more of the wool from Jeffco. *Id.* at 27.

Jeffco's president, Alfred I. Lonstein, testified at his deposition, the transcript of which was received in evidence, that Jeffco purchased approximately 18,600 pounds of the fine scoured Australian lamb's wool from FHC for $2.40 per pound and resold it to Carleton Woolen Mills ("Carleton") for $2.80 per pound. Defendant's Exhibit B at 28.

Carleton, a woolen mill,[5] bought the wool from Jeffco because of Carleton's desire to take over the niche in the business created by FHC's demise. Tr. at 103–04. All of the wool which Carleton purchased from Jeffco was made by Carleton into a very fine, all wool flannel type cloth, some of which had a sueded finish. Tr. at 107, 132–33. Edward P. LeVeen, the former owner and president of Carleton, testified that all of the wool was run using a peralta, but with no special precautions, with no difficulties whatsoever. Tr. at 101, 109–10, 113 and 135–36. He described the wool as "near perfect" and denied finding a material amount of skin in it. Tr. at 114–15. On cross-examination by FHC, LeVeen opined that although he had purchased the wool for $2.80 per pound, he could still have made a profit if he had purchased it at over $4.00 per pound, as had FHC. Tr. at 136–37.

In March 1982, FHC's textile expert, Gerald M. Varley, inspected samples of 82 bales of the wool[6] and found that 52 out of the 82 contained excessive numbers of skin pieces, rendering the wool unsuitable for FHC's sensitive machinery. Tr. at 16, 28–29. In his opinion, had FHC run the wool, defective yarn or fabric might have resulted. Tr. at 28. He admitted, however, that

if a flannel had been manufactured out of wool containing as much skin as he had extrapolated must be present in the wool sold to FHC, the matting of the flannel "would tend to bury the skin pieces ... [so that] you might be able to get away with a problem like this in a flannel." Tr. at 90. He denied that it would have been economically feasible to have utilized a peralta as part of the production process for wool costing $4.12 per pound in 1981. Tr. at 74.[7] Varley recognized, however, that no two mills produce their products in exactly the same manner with exactly the same types of machines. Tr. at 52. Although Varley conducted laboratory analyses of the samples which he collected, he admitted that anyone experienced in the manufacture of wool should have been aware of the skin problem after a visual inspection of the opened bales. Tr. at 87.

PROPOSED CONCLUSIONS OF LAW

### I. *Personal Jurisdiction*

E.Y. Neill contests the court's acquisition of personal jurisdiction, arguing not that the provisions for nationwide service of process, former Fed.R.Bankr.P. 704 and present Fed.R.Bankr.P. 7004, were not complied with, but that since the court lacks subject matter jurisdiction, no underpinning for personal jurisdiction exists. That position has already been considered and rejected by this circuit in *Belford v. Martin-Trigona* (*In re Martin-Trigona*), 763 F.2d 503 (2d Cir.1985) (*per curiam*) in relation to the issue of whether service by first-class mail is constitutional. The court stated:

> However, appellants contend that reliance on Rule 704 was questionable in light of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458

Exhibit P at 24–26; Plaintiff's Exhibit 16. When confronted with the letter, Symosek explained that he could not use the wool in the intended plant, which had no peralta, Plaintiff's Exhibit P at 24, but that the wool was used elsewhere, with a peralta, to make sweaters. *Id.* at 19, 31.

**5.** A woolen mill produces "woolens," fabrics which characteristically have a helter-skelter arrangement of fibers; a worsted mill produces "worsteds," fabrics of somewhat finer quality

which characteristically have parallel fibers. Tr. at 128. The processes used for producing the two products vary. Tr. at 118.

**6.** He did not examine the six bales previously sold to Old Colony.

**7.** Pearson voiced a similar conclusion. Tr. at 221.

U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). We reject this contention. Nothing in *Northern Pipeline* indicated that the bankruptcy rules were invalid. Further, the uninterrupted legitimacy of former Rule 704(c) is evidenced by its retention substantially unchanged as Rule 7004(b) of the new bankruptcy rules, promulgated after *Northern Pipeline.* We conclude that appellee's service of process by first class mail to the above addresses was effective and that the district court has personal jurisdiction over appellants.

763 F.2d at 505.

■ Defendant's argument that it was not amenable to service under New York's long-arm statute, N.Y.C.P.L.R. § 302(a) (McKinney 1972 and Supp.1986), is irrelevant. *See Mariash v. Morrill,* 496 F.2d 1138, 1143 (2d Cir.1974) (upholding jurisdiction of district court in New York over defendants served in Massachusetts under the Securities Exchange Act of 1934). For,

> [w]here Congress has authorized nationwide service of process by federal courts under specific federal statutes, so long as the assertion of jurisdiction over the defendant is compatible with due process, the service of process is sufficient to establish the jurisdiction of the federal court over the person of the defendant.

*Hogue v. Milodon Engineering, Inc. (In re Hogue* ), 736 F.2d 989, 991 (4th Cir.1984) (deciding a case under the Bankruptcy Act of 1898 and construing former Rule 704) [citing *Terry v. Raymond International, Inc.,* 658 F.2d 398, 401–03 (5th Cir.1981) (manufacturer of crane became amenable to personal jurisdiction under a federal standard merely by virtue of plaintiff's federal maritime claim against his employer, despite fact that only basis for manufacturer's liability arose from state law), *cert. denied sub nom. Manitowoc Engineering Co. v. Terry,* 456 U.S. 928, 102 S.Ct. 1975,

72 L.Ed.2d 443 (1982) ]; *see B.W. Development Company, Inc. v. John B. Pike & Son, Inc. (In re B.W. Development Company, Inc.),* 49 B.R. 129 (Bankr.W.D.Ky. 1985); *Allard v. Benjamin (In re DeLorean Motor Co.),* 49 B.R. 900 (Bankr.E.D. Mich.1985). To be sure, the due process clause of the Fifth Amendment cannot be abridged; the authorized nationwide service of process must be reasonably calculated to inform the defendant of the pendency of the proceedings in order that he may have an opportunity to be heard in his defense. *Mariash, supra,* 496 F.2d at 1143.

■ A *Marathon*-type lawsuit brought by a debtor is a "federal question" matter for jurisdictional purposes such that the test of minimum contacts with the state set forth in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 *reh. denied,* 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958), need not be met because of Congress' authorization of nationwide service of process. *Chemical Bank v. Grisby's World of Carpet, Inc. (In re WWG Industries, Inc.),* 44 B.R. 287 (N.D.Ga.1984); *Pongetti v. Laws (In re Self* ), 51 B.R. 683, 685 (Bankr.N.D.Miss.1985); *see Mariash, supra,* 496 F.2d 1143, n. 7; *Securities Investor Protection Corp. v. Vigman,* 764 F.2d 1309, 1315 (9th Cir.1985); *Johnson Creative Arts, Inc. v. Wool Masters, Inc.,* 743 F.2d 947 (1st Cir.1984).[8] No abridgement of due process occurs by virtue of nationwide service of process authorized by Congress; rather, the defendant must look primarily to federal venue requirements for protection from onerous litigation. *Hogue, supra,* 736 F.2d at 991; *Fitzsimmons v. Barton,* 589 F.2d 330, 334 (7th Cir.1979). We conclude that personal jurisdiction over E.Y. Neill exists.

---

**8.** Bound as we are by the Second Circuit's decisions in *Mariash v. Morrill* and *Martin-Trigona, supra,* we need not discuss the possible implications of *Burger King Corporation v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). We note, however, that *Burger King* involved a diversity lawsuit and Fourteenth Amendment due process considerations, not a federal question lawsuit and Fifth Amendment due process considerations. *See* J. Yacos, Broken Bench Review, Vol. 4, No. 9 (Nov.1985).

## II. *Failure To Timely Reject and to Give Notice of Claimed Defects*

E.Y. Neill urges that judgment must, as a matter of law, be rendered in its favor because of FHC's failure to timely reject the goods and to give notice of the claimed defects. Plaintiff counters by arguing that it orally rejected the wool in August, because of lateness, that the term of E.Y. Neill's confirmation requiring written notice within 30 days did not form a part of the parties' contract and that FHC's written rejection of the goods in January was timely.

■■■ Pursuant to section 2–602 of the Uniform Commercial Code,[9] goods must be rejected within a reasonable time after delivery. N.Y.U.C.C. § 2–602(1) (McKinney 1964). Where the buyer has had a reasonable opportunity to inspect the goods, but has failed to make an effective rejection under section 2–602, then the goods are deemed accepted. N.Y.U.C.C. § 2–606(1)(a) (McKinney 1964). Section 2–607 bars the buyer from any remedy where the buyer has failed to notify the seller of a breach within a reasonable time after discovering the same, or after such breach should have been discovered. N.Y.U.C.C. § 2–607(3)(a) (McKinney 1964). What constitutes a reasonable time to notify depends on the particular facts of each case, but where, as here, there has been a delay of nearly five months before any notification, the buyer had ample opportunity to and did in fact examine the goods, discovering the alleged defect, we hold that notification was untimely. In so holding, we reject FHC's argument that Renny's telephone conversation with Neill in which he asked Neill to find a buyer for the wool constituted an oral rejection. Renny testified only that "[a]bout a week before we received the wool I called [Neill] up and asked—I told him we are closing down, I would like him to sell it to somebody else." Tr. at 170–71. This request to sell was predicated upon the closing of the mill; Renny made no

reference to the claimed lateness of the delivery or the claimed unmerchantability of the wool. Thus, FHC erroneously relies on comment 4 to N.Y.U.C.C. § 2–607, which provides that a notification which preserves the buyer's rights need not set forth all objections which will be relied on by the buyer, for here, there was no notification whatsoever. *See, e.g., Simon & Schuster, Inc. v. Howe Plastics & Chemicals Co., Inc.* 105 A.D.2d 604, 481 N.Y.S.2d 82 (1st Dep't 1984) (untimely where buyer failed to object to alleged late delivery for nearly two and one-half years); *Societe Nouvelle Vaskene v. Lehman Saunders, Ltd.,* 14 U.C.C.R.S. 692 (Sup.Ct.N.Y.Co. 1974) (discussed *infra*); *U.S. Nemrod, Inc. v. Wheel House Dive Shop, Inc.,* 120 Misc.2d 156, 465 N.Y.S.2d 674 (Civ.Ct.1983) (notification timely where given on date of delivery); *Import Traders, Inc. v. Frederick Manufacturing Corp.,* 117 Misc.2d 305, 457 N.Y.S.2d 742 (Civ.Ct.1983) (rejection ineffective where buyer had a reasonable opportunity to inspect but was silent for five months).

In the *Vaskene* case, *supra,* some of the goods were delivered in the latter part of August, with the balance being delivered in the latter part of October. The buyer, however, did not notify the seller that the garments were sized in a faulty manner until December, despite discovering the defect sometime in early November. The court concluded that where the buyer had a reasonable opportunity to inspect, and where the alleged defect was discovered at least a month before the seller's being notified, the buyer's purported rejection was untimely as a matter of law. 14 U.C.C.R.S. at 693. The instant dispute presents facts more egregious than those in *Vaskene.*

In an effort to overcome *Vaskene,* FHC directs our attention to three cases, none of which we find helpful to FHC, *Creusot-Loire International, Inc. v. Coppus Engineering Corp.,* 585 F.Supp. 45 (S.D.N.Y. 1983); *Schnitzer v. Lang,* 239 N.Y. 1, 145

---

**9.** Although the parties allude to a potential conflict of laws issue over whether to apply the law of New York, Massachusetts, or Maine, they concede that the U.C.C. so far as relevant is identical in all three states.

N.E. 65 (1924); and *White Devon Farm v. Stahl*, 88 Misc.2d 961, 389 N.Y.S.2d 724 (Sup.Ct.1976). In *Creusot-Loire*, revocation of the acceptance of certain burners which was made over a year beyond delivery was deemed timely. In that case, however, revocation was made within the warranty period, and any delay in revoking was due to the buyer's reasonable reliance on the seller's assurances that the burners would work. 585 F.Supp. at 50.

*Schnitzer's* buyer had received only part of a shipment of silk by the stipulated delivery date for the whole order. He inspected the partial shipment of goods upon its arrival but did not discover a latent defect, lack of colorfastness. He notified the seller that because the balance of the delivery was late, he would set aside the partial delivery until the following season, by which time the remainder would have been delivered. Seven months after the balance of the goods was delivered (but more than a year after the first shipment was delivered), the buyer discovered the defect and immediately notified the seller. The *Schnitzer* court declined to impose upon the buyer a duty to resort to extraordinary tests to discover latent defects because he had tested a sample of the goods before entering into the contract, finding the sample colorfast, and because he had promptly inspected the goods upon their arrival. In our case, the alleged defect was patent and actually discovered upon inspection, yet notification was delayed for almost five months.

In *White*, the parties contracted in 1969 to sell an interest in a racehorse. It was agreed that the horse could be raced until November 1, 1970 and was thereafter to be retired to stud. The seller agreed that after November 1 he would have the horse tested and would obtain certain certifications from veterinarians relating to suitability for breeding, failing which the buyer could rescind the purchase. In December 1970, the buyer notified the seller that the test results were unsatisfactory. The court held that the defects were latent and that the fixing of a specific date for inspection precluded any holding that the inspection and rejection were untimely. In our case, where the alleged defect was patent and no schedule for delayed inspection was agreed to, an opposite result is compelled.

FHC's reliance on *Wullschleger & Co., Inc. v. Jenny Fashions, Inc.*, 618 F.Supp. 373 (S.D.N.Y.1985), is similarly misplaced. There, the purchaser diligently examined the fabric upon receipt but failed to discover the latent defect, that the material was skewed, until after the fabric was made into dresses. Consequently, disclaimers in the seller's invoices were held not to relieve it of liability for breach of warranty for selling defective goods. Our reading of *Wullschleger* compels us to conclude that FHC is barred from recovery.

As to FHC's argument that the clause requiring 30 days' written notice did not form a part of the parties' contract, we conclude, first, that, as discussed above, regardless of that clause the notice given was untimely and, second, that inasmuch as Pearson signed E.Y. Neill's confirmation, which provided for a reasonable time for complaints, the clause did become a part of the parties' contract. *See* N.Y.U.C.C. § 2–207(2) and Official Comments 3 and 5 thereto. Such clauses are enforceable and, here, the clause is controlling. *See Miron v. Yonkers Raceway, Inc.*, 400 F.2d 112, 120 (2d Cir.1968).

Because there is no evidence in the record that any notice, let alone written notice, was given until January 25, 1982, FHC is barred as a matter of law from recovering on its claim for allegedly defective wool and for alleged late delivery, particularly since the alleged breaches were patently evident by early September, 1981. *See Philip A. Feinberg, Inc. v. Bernstein & Sparber Corp.*, 8 U.C.C.R.S. 190 (N.Y. Sup.Ct., App.Term, 1st Dep't 1970); *SCA International, Inc. v. Garfield & Rosen, Inc.*, 337 F.Supp. 246 (D.Mass.1971).

### III. *FHC has Failed To Prove that E.Y. Neill Breached the Contract*

#### A. *Timeliness of Delivery*

The parties are in sharp discord concerning the delivery terms of their contract.

FHC contends that delivery was to have been as stated in its purchase order, E.Y. Neill, as stated in its confirmation. In the alternative, FHC contends that if the confirmation is found to embody the original terms of the parties' contract, then that contract was modified by E.Y. Neill's letter of June 17, 1981 (Plaintiff's Exhibit 20) informing Ullman that the first 10,000 pounds of wool would be sent on a ship due in Boston about August 4.

We conclude that, based on the negotiations between Ullman and Neill, the confirmation signed by Pearson, the letter of credit application and the letter of credit itself, the parties contemplated delivery of the wool as soon as possible and no later than September 20, 1981. In so concluding, we discount Renny's testimony that FHC understood the contract to require delivery of 10,000 pounds in mid-July and the remainder in mid-August. Tr. at 153. We do so because the documents belie that interpretation of the contract, because Renny was not shown to have any personal knowledge of the agreement reached by Ullman and Neill, and because FHC offered no testimony or other evidence in refutation of Neill's testimony respecting his agreement with Ullman. Pearson's acceptance of E.Y. Neill's confirmation, which no one has challenged as unauthorized, is in particular highly persuasive "indicia of assent." *See Ernest J. Michel & Co., Inc. v. Anabasis Trade, Inc.,* 72 A.D.2d 715, 422 N.Y.S.2d 79 (1st Dep't 1979) (arbitration clause contained in seller's confirmations upheld where buyer signed and returned the first of seven identical confirmatory memoranda, and where buyer never objected to the inclusion of the term), *aff'd,* 50 N.Y.2d 951, 431 N.Y.S.2d 459, 409 N.E.2d 933 (1980). *See also Matter of Marlene Industries Corp.,* 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239 (1978).

 We reject plaintiff's argument that subsection 2–207(3) of the Uniform Com-

mercial Code should control the parties' dispute. Pursuant to subsection (3), "the terms of the contract are the terms of the exchanged writings to the extent they are consistent, 'together with any supplementary terms incorporated under any other provision of this act.'" *Rite Fabrics, Inc. v. Stafford-Higgins Co., Inc.,* 366 F.Supp. 1, 8 (S.D.N.Y.1973) (quoting N.Y.U.C.C. § 2–207(3) (McKinney 1964)). Thus, the conflicting terms will cancel each other out, bringing the U.C.C. gap-filler provisions to the fore. *Id.*

This analysis is applied where merchants have exchanged conflicting memoranda, neither of which was signed by the other party. *See, e.g., C. Itoh & Co. (America) Inc. v. The Jordan International Co.,* 552 F.2d 1228 (7th Cir.1977) (buyer never expressly assented to the challenged term); *Matter of Marlene Industries Corp., supra,* 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239 (1978) (discussed *infra*); Baird & Weisberg, *Rules, Standards, and the Battle of the Forms: A Reassessment of § 2–207,* 68 Va.L.Rev. 1217 (1982). In the instant case, however, Pearson signed E.Y. Neill's confirmation, thus assenting to the "as soon as possible" delivery term. Even if this were not the case, a reasonable time for delivery rather than plaintiff's unaccepted terms would be read into the contract pursuant to Section 2–207(3) and 2–309(1).[10]

 We turn now to plaintiff's contention, which we reject out of hand, that the June 17, 1981 letter modified the earlier agreement as to delivery, thereby "guaranteeing" an August 4 delivery date. Nowhere does that letter, which appears to be informational only, purport to modify the contract. The language employed, that the ship is due in Boston "about August 4th" hardly rises to the level of guarantee of delivery on that date.

 Having determined that no modification to the contract was effected, we

---

**10.** Subsection 2–309(1) of the U.C.C. provides that: "The time for shipment or delivery or any other action under a contract if not provided in this Article or agreed upon shall be a reasonable time." N.Y.U.C.C. § 2–309(1) (McKinney 1964).

must next determine whether delivery was made "as soon as possible" but not later than September 20, 1981 where goods which were ordered on April 30, 1981 were available to be picked up on August 25 of the same year. Plaintiff directs the court's attention to *Craine, Inc. v. Platt,* 49 N.Y. S.2d 709 (Sup.Ct.1944). There, a delivery term of "soon as possible" was interpreted as meaning "as soon as can be done, using the greatest diligence." *Id.* at 711–12. The *Craine* court further reasoned that the seller "would have a *reasonable time* in which to make delivery [and] time would not be of the essence...." *Id.* at 712 (emphasis added). Here, since the parties contemplated that delivery might be effected up until September 20, 1981, delivery almost a month before that date was per-force reasonable.

Moreover, Neill testified, without contradiction, that from the inception of his discussions with Ullman he informed Ullman that no shipping date could be guaranteed because of the Australian labor situation. There is thus ample evidence to support a finding that so much of the exculpatory clause as pertained to delay caused by strikes formed part of the parties' contract. But, in any event, the exculpatory clause at least represents an additional term within the purview of section 2–207(2) of the Uniform Commercial Code. That section contains a special rule for merchants, stating that additional terms will "become part of the contract unless ... they materially alter it ...." N.Y.U.C.C. § 2–207(2) (McKinney 1964).

The leading New York case on the "battle of the forms" is *Matter of Marlene Industries, Corp., supra,* 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239. After an exhaustive analysis of the status of the law under section 2–207, the *Marlene* court held that the arbitration clause contained in the seller's form materially altered the agreement and thus would "not become a part of such a contract unless both parties explicitly agree[d] to it." *Id.* at 333, 408 N.Y.S.2d 410, 380 N.E.2d 239. The court's *ratio decidendi* was the fact that neither party had signed the other's form. *Id.* at

330, 408 N.Y.S.2d 410, 380 N.E.2d 239. In the case at bar, however, FHC signed and returned E.Y. Neill's confirmatory memorandum, thus providing the requisite assent. This strike clause thus became a part of the contract.

When considering the efforts undertaken by Neill vis-a-vis the strike situation, FHC's agreement that delivery dates would be modified to the extent necessitated by events beyond the seller's control, and the availability of the wool almost one month prior to the expiration date of the letter of credit, there is ample evidence to support a finding that delivery was effected within a reasonable time as mandated by *Craine.* Thus, contrary to the contentions of plaintiff, delivery of the wool in question was not late.

### B. *Breach of Warranty*

FHC contends that E.Y. Neill breached the contract by shipping wool which contained too many skin pieces. The parties agree that all wool of this type normally contains some skin, but disagree as to whether the skin content of this wool was so excessive as to make the wool unmerchantable.

■ FHC contends that defendant breached the contract under each of two distinct warranty theories. The first is grounded in section 2–314, which provides that a warranty of merchantability is implied in every sale of goods in which the seller is a merchant dealing in goods of that kind. N.Y.U.C.C. § 2–314 (McKinney 1964). *See generally Wullschleger, supra.* Satisfaction of this implied warranty entails a finding "that the article is reasonably fit for the ordinary uses for which it was manufactured and [it] need only be of 'medium quality or goodness.'" *United States Leasing Corp. v. Comerald Associates, Inc.,* 101 Misc.2d 773, 777, 421 N.Y. S.2d 1003 (Civ.Ct.1979) (quoting *Schwartz v. Macrose Lumber & Trim Co., Inc.,* 50 Misc.2d 547, 552, 270 N.Y.S.2d 875 (Sup.Ct. 1966), *rev'd on other grounds,* 29 A.D.2d 781, 287 N.Y.S.2d 706 (2d Dep't 1968),

*aff'd,* 24 N.Y.2d 856, 301 N.Y.S.2d 91, 248 N.E.2d 920 (1969)). *See also Nassau Suffolk White Trucks, Inc. v. Twin County Transit Mix Corp.,* 62 A.D.2d 982, 403 N.Y.S.2d 322 (2d Dep't 1978) (reasoning that the term merchantable under section 2–314 does not mean perfect).

■ Applying this standard to the facts before us, we find that FHC has not proven that the wool contained so much skin as to render it unmerchantable. Although the wool admittedly contained some skin, it is clear from the record that that is common for the type of wool sold. In addition, under a section 2–314 analysis, all we need find is that the wool be reasonably fit for its ordinary uses, not that it be perfect. *Comerald, supra,* 101 Misc.2d at 777, 421 N.Y.S.2d 1003.

Notwithstanding Varley's testimony as to skin content and his opinion that the wool was only worth about $2.80 per pound, Symosek bought some of the wool at $3.45 per pound and sought to purchase the balance at that price. In addition, LeVeen ran the wool successfully, and testified that it would have been economically feasible to have run the wool at the price paid by FHC. We find the statements of the persons who actually purchased and manufactured this wool to be more persuasive as to its overall suitability and quality than the testimony of an expert witness who, although undoubtedly competent, did not have the benefit of observing the favorable results of the manufacturing process and dealt only with a relatively small portion of the shipment.

Moreover, FHC itself described the wool as "Fine Scoured Australian Lambs" upon its resale, never informing any prospective purchasers that the wool was not of that quality or that it contained too much skin. Thus, it is evident that FHC was treating the wool as merchantable.

FHC erroneously relies for support upon *Wullschleger,* for there, the parties conceded that the fabric was defective and the defect was a latent one, undiscovered by the purchaser until the goods were used in the manufacturing process. Here, plaintiff has not met its burden of showing that the wool was not fit for ordinary uses and even plaintiff's own expert conceded that the alleged defect was readily discoverable upon inspection of the wool. There has been no showing, as in *Wullschleger,* that in the wool industry it is incumbent upon the seller to inspect for the type of defect here alleged.

■ The second implied warranty upon which FHC relies is the warranty of fitness for a particular purpose. Pursuant to section 2–315 of the UCC, such a warranty arises only "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods...." N.Y.U.C.C. § 2–315 (McKinney 1964); *see Agricultural Services Association, Inc. v. Ferry-Morse Seed Co.,* 551 F.2d 1057, 1065 (6th Cir.1977) (California law); *Computerized Radiological Services, Inc. v. Syntex Corp.,* 595 F.Supp. 1495, 1508 (E.D.N.Y. 1984), *rev'd in part on other grounds,* 786 F.2d 72 (1986); *Emerald Painting, Inc. v. PPG Industries, Inc.,* 99 A.D.2d 891, 472 N.Y.S.2d 485 (3rd Dep't 1984). Here, neither of the required showings to establish such a warranty has been made. Clearly, the sending of a sample of the wool to FHC and its acceptance by FHC is at odds with the wholly unsupported claim that E.Y. Neill knew that FHC was relying upon the seller to select appropriate wool. Moreover, Carleton in fact used the wool to produce a fabric with a sueded finish. That the successful use of the wool required a peralta which FHC did not possess is simply insufficient to establish that the wool was unmerchantable.

## CONCLUSION

We conclude that the district court has both subject matter and personal jurisdiction, that judgment, as a matter of law, should be rendered in E.Y. Neill's favor because of FHC's failure to timely reject the goods and to give notice of the claimed

defects, and that FHC has failed to prove, in any event, that delivery was untimely, that the wool was unmerchantable and that E.Y. Neill breached an implied warranty of fitness for a particular purpose. Having so concluded, we see no reason to reach issues respecting the proper calculation of damages.